Bonny HANSON, Plaintiff
and Appellant,

v.

WILLIAMS COUNTY, North Dakota;
and Ingram Manufacturing Company,
Inc., Defendants and Appellees.

Civ. No. 11066.

Supreme Court of North Dakota.

June 6, 1986.

Rolfstad, Winkjer, McKennett & Stenehjem, Williston, for plaintiff and appellant; argued by Dean Winkjer; appearance by Donna M. Murphy.

Bjella, Neff, Rathert, Wahl & Eiken, Williston, for defendant and appellee Williams County.

Nilles, Hansen, Magill & Davies, Fargo, for defendant and appellee Ingram Mfg. Co.; argued by Stephen W. Plambeck; appearance by Richard Henderson.

GIERKE, Justice.

Bonny Hanson, plaintiff, appeals from a district court judgment dismissing her products liability action on the basis that the claims against the manufacturer were

barred by § 28–01.1–02 of the North Dakota Century Code. Hanson challenges the constitutionality of § 28–01.1–02. We conclude that § 28–01.1–02 violates Article I, § 21, of the North Dakota Constitution, and, accordingly, reverse and remand for trial.

Ingram Manufacturing Company, Inc., manufactured a multi-ton earth packer on November 13, 1963. This earth packer was sold to Krider Equipment Company of Fargo in April of 1964. Krider sold the earth packer to the State of North Dakota, which in turn sold it to Williams County on July 9, 1980.

Todd Hefta, the 22–year-old son of Hanson, was an employee of the city of Williston at the time the earth packer was borrowed by the city from Williams County. Hefta was assigned to do various tasks with fellow city employee Wayne Courchene. Their tasks included operating the earth packer.

On August 24, 1983, as Courchene mounted the packer to start it, Hefta walked behind the packer to get a drink of water from a cooler that was sitting on the back of the machine. Before starting the machine, Courchene allegedly checked the clutch to make sure it was out of gear. As Hefta was getting a drink of water, Courchene touched the starter button and the earth packer "jumped backwards", running over Hefta and killing him.

On April 19, 1984, Hanson filed an action for wrongful death pursuant to Chapter 32–21, N.D.C.C., alleging negligence, breach of implied warranty, and strict liability in tort.[1] Ingram moved for summary judgment of dismissal of Hanson's complaint on the basis of § 28–01.1–02(1), N.D.C.C., which provides:

"*28–01.1–02. Statute of limitation.*

"1. *There shall be no recovery of damages for* personal injury, *death,* or damage to property caused by a defective product, except as provided in subsections 4 and 5, *unless the* injury, *death,* or damage *occurred within ten years of the date of initial purchase for use or consumption, or within eleven years of the date of manufacture of a product,* where that action is based upon, or arises out of, any of the following:

a. Breach of any implied warranties.

b. Defects in design, inspection, testing, or manufacture.

c. Failure to warn.

d. Failure to properly instruct in the use of a product." [Emphasis added.]

The district court granted Ingram's motion for summary judgment and dismissed Hanson's claim against Ingram.

The basic issue on appeal is whether § 28–01.1–02, N.D.C.C., the "statute of limitation" of the North Dakota Products Liability Act, violates our Federal or State Constitution.

In 1977 the Legislature adopted Senate Concurrent Resolution 4030, which directed the Legislative Council to study the availability and affordability of products liability insurance and related insurance problems in North Dakota.

After receiving considerable testimony, a majority of the committee members recommended that the Legislative Assembly pass two bills, *i.e.*, House Bills Nos. 1075 and 1589. Together, these two bills form the North Dakota Products Liability Act. After some minor amendments, these bills were passed by the 46th Legislative Assembly and are now codified in Chapter 28–01.1, N.D.C.C.[2]

During discussions on the North Dakota Products Liability Act, much of the testimony received by the legislative committees concerned the "statute of limitation" [¶ 2 of H.B. No. 1075, and now codified as § 28–01.1–02(1), N.D.C.C.]. Proponents of

---

1. In her original complaint Hanson also alleged fraud, misrepresentation, and violation of OSHA regulations. Those allegations, however, are no longer material to this case.

2. House Bill No. 1075, after being initially passed by the 46th Session of the North Dakota Legislature, was vetoed by the Governor. The Legislature, however, overrode the Governor's veto.

the Products Liability Act argued that the cost of products liability insurance had become unaffordable to many North Dakota manufacturers and that the statute of limitation was essential in order to carry out the intent of the bill, *i.e.*, to reduce the cost of products liability insurance in North Dakota. Opponents argued that the bill was unfair and it could not accomplish its intended purpose because products liability insurance rates were set on a national basis, not by individual state policies.[3]

While the Products Liability Act was supported by a majority of the members of the Interim Committee on Products Liability, a minority of the committee members strongly opposed the new "statute of limitation". The minority members of the committee believed this part of the Act would unfairly limit the compensation available to innocent victims and questioned the constitutionality of such a provision. Governor Link, in his veto message, also questioned the fairness of this "statute of limitation".[4]

### Statute of Repose

 While § 28-01.1–02, N.D.C.C., is captioned "Statute of limitation", this section is, in effect, a statute of repose. Statutes of repose are different from statutes of limitation, although they have comparable effects. *See Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985); Mc-Govern, *The Variety, Policy and Constitutionality of Product Liability Statutes of Repose*, 30 Am.U.L.Rev. 579, 582–587 (1981). A statute of limitation bars a right of action unless it is filed within a specified period of time after an injury occurs. The purpose of a statute of limitation is to prevent "plaintiffs from sleeping on their legal rights to the detriment of defendants". Dickson, *The Statute of Limita-*

*tions in North Dakota's Products Liability Act: An Exercise in Futility?*, 59 N.D. L.Rev. 551, 556 (1983); *State v. Halverson*, 69 N.D. 225, 226, 285 N.W. 292, 293 (1939). A statute of limitation period commences either upon the occurrence of an injury, or when the injury is discovered. A statute of limitation must allow a reasonable time after a cause of action arises for the filing of a lawsuit. *Wilson v. Iseminger*, 185 U.S. 55, 62, 22 S.Ct 573, 575, 46 L.Ed. 804, 807 (1902); *Berry, supra.*

A statute of repose terminates any right of action after a specific time has elapsed, regardless of whether or not there has as yet been an injury. Frumer and Friedman, *Products Liability*, § 16C(2)(i) (1985). A statute of repose period begins to run from the occurrence of some event other than the event of an injury that gives rise to a cause of action and, therefore, bars a cause of action before the injury occurs. A person injured after the statutory period of repose is left without a remedy for the injury. Because of this harsh result, many courts have found statutes of repose to be unconstitutional. *Berry, supra; Kennedy v. Cumberland Engineering Co., Inc.*, 471 A.2d 195 (R.I.1984); *Heath v. Sears, Roebuck & Co.*, 123 N.H. 512, 464 A.2d 288 (1983); *Lankford v. Sullivan, Long & Hagerty*, 416 So.2d 996 (Ala.1982); *Phillips v. ABC Builders, Inc.*, 611 P.2d 821 (Wyo. 1980); *Saylor v. Hall*, 497 S.W.2d 218 (Ky. 1973).

Courts which have declared statutes of repose unconstitutional have done so on the basis of different constitutional rights. Some courts have relied at least in part on "open courts" provisions in State constitutions. *Berry, supra; Daugaard v. Baltic Co-op. Bldg. Supply Assoc.*, 349 N.W.2d

---

3. The argument that a statute which has the purpose of controlling insurance rates which are set on a national basis cannot achieve its purpose was also presented to us in *Arneson v. Olson*, 270 N.W.2d 125, 136 (N.D.1978). In *Arneson*, after observing that a statute limiting the recovery in medical malpractice cases could not achieve its intended purpose, this court held that it violated the equal protection provision of the North Dakota Constitution.

4. Since its passage, the North Dakota Products Liability Act has not gone unchallenged [*See* Dickson, *The Statute of Limitations in North Dakota's Products Liability Act: An Exercise in Futility?*, 59 N.D.L.Rev. 551 (1983); Kraft, *The North Dakota Equity for Tortfeasors Struggle—Judicial Action vs. Legislative Over-Reaction*, 56 N.D.L.Rev. 67 (1980) ].

419 (S.D.1984); *Lankford, supra* 416 So.2d 996.[5] Courts have also relied in part on the due process clauses of State constitutions. *Berry, supra.* Statutes of repose have also been declared violative of equal protection provisions of Federal and State constitutions. *Heath, supra* 464 A.2d 288. Some courts have used a combination of these constitutional provisions along with state wrongful death constitutional provisions to invalidate statutes of repose. *Berry, supra; Kennedy, supra* 471 A.2d 195; *Saylor, supra* 497 S.W.2d 218.[6] Contrarily, a number of courts have held statutes of repose to be constitutional under these same constitutional provisions.[7]

### Constitutional Question

In challenging the constitutionality of § 28–01.1–02, N.D.C.C., Hanson relies upon Article I, § 9, of the North Dakota Constitution which provides, in pertinent part, the following:

> "*Section 9.* All courts shall be open, and every man for any injury done him in

his lands, goods, person or reputation shall have remedy by due process of law, and right and justice administered without sale, denial or delay...."

Hanson also invokes the following part of the Fifth Amendment to the United States Constitution:

> "No person shall ... be deprived of life, liberty, or property, without due process of law; ..."

and § 1 of the Fourteenth Amendment to the United States Constitution which, in pertinent part, provides:

> "*§ 1.* ... No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Hanson's arguments marshal the "open courts" provision of the North Dakota Con-

---

5. Recently in *Andrews v. O'Hearn, M.D.,* 387 N.W.2d 716 (N.D.1986) we discussed Article I, § 9. The Andrewses relied upon this provision and construed it to be a guarantee of a remedy through our state judicial system. We noted that the open courts provision has never been interpreted by this court to be an absolute right, *Andrews, supra*:

 "The non-absolute character of Section 9 is readily apparent by a review of this court's decisions interpreting that section as not requiring a remedy for every alleged wrong. And, although this court has, on occasion, used this provision of the North Dakota Constitution to correct a substantive error, we do not believe that Section 9 was intended to promote this court to the position of a super-legislature in charge of ensuring perfect justice and complete remedies, thereby supplanting the traditional function of the jury, the standards employed to evaluate a jury decision, and the rules of evidence, such as Rule 606(b), that protect jury independence by preventing judicial overseeing of the internal workings of the jury. Although there may be occasions where this State constitutional provision is properly employed to protect a litigant against a deprivation of due process, to avert a harsh result that is otherwise inevitable, or to prevent the destruction of the only opportunity for an appropriate remedy, we do not believe that such a situation exists here." *Andrews, supra* 387 N.W.2d at 723.

6. The North Dakota Constitution does not contain a specific wrongful death civil recovery provision.

7. *Pullum v. Cincinnati,* 476 So.2d 657 (Fla.1985) [statute of repose does not violate equal protection clause]; *Tetterton v. Long Mfg. Co. Inc.,* 314 N.C. 44, 332 S.E.2d 67 (1985) [statute of repose does not violate equal protection or State constitutional provision on open courts]; *Davis v. Whiting Corp.,* 66 Or.App. 541, 674 P.2d 1194 (1984), *cert. denied,* 297 Or. 82, 679 P.2d 1367 (1984) [statute of repose does not violate due process, equal protection, or access to court provisions of the constitution]; *Stutts v. Ford Motor Co.,* 574 F.Supp. 100 (M.D.Tenn.1983) [statute of repose does not violate open court provisions of State constitution]; *Yarbro v. Hilton Hotels Corp.,* 655 P.2d 822 (Colo.1983) [statute of repose does not violate due process or equal protection]; *Dague v. Piper Aircraft Corp.,* 275 Ind. 520, 418 N.E.2d 207 (1982) [statute of repose does not violate State open court provision]; *Thornton v. Mono Mfg. Co.,* 99 Ill.App.3d 722, 54 Ill.Dec. 657, 425 N.E.2d 522 (1981) [statute of repose does not violate due process]; *Rosenberg v. Town of North Bergen,* 61 N.J. 190, 293 A.2d 662 (1972) [statute of repose does not violate equal protection clause of Federal Constitution].

stitution, along with due process and equal protection challenges.[8]

We apply an equal protection analysis to § 28–01.1–02. Essential to our analysis of the constitutionality of this statute is a focus on the application of the appropriate standard of review.

### Standard of Review

■ We discussed the three standards of review applicable when a statute is challenged on equal protection grounds in *Johnson v. Hasset*, 217 N.W.2d 771 (N.D. 1974). We noted that there is a group of cases involving "inherently suspect" or "fundamental interest" classifications which are analyzed under the heightened level of review, strict scrutiny.[9] *Johnson, supra,* 217 N.W.2d at 775. The rational basis standard of review is at the other end of the spectrum. When applying this standard of review, a legislative classification will be sustained unless it is patently arbitrary and bears no rational relationship to a legitimate government interest. *Johnson, supra; Arneson v. Olson,* 270 N.W.2d 125, 133 (N.D.1978). Finally, in *Johnson,* we noted that there is an intermediate standard of review which, although less clearly defined, required a "close correspondence between statutory classification and legislative goals". *Arneson, supra* 270 N.W.2d at 133.[10]

**8.** Although Hanson has not specifically identified our State constitutional provisions on equal protection and due process, questions as to these provisions have been raised. After referring to the United States constitutional provisions on equal protection and due process, Hanson primarily looks to our State Constitution. She refers to State cases to support her proposition and applies constitutional standards of review based on North Dakota equal protection and due process case law.

The North Dakota constitutional provision guaranteeing equal protection of the laws is Article I, § 21, which provides:

"*Section 21.* No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens."

The following part of Article I, § 12, of the North Dakota Constitution guarantees due process of law:

"*Section 12.* ... No person shall ... be deprived of life, liberty or property without due process of law."

**9.** Cases in which we have applied strict scrutiny include *State ex rel. Olson v. Maxwell,* 259 N.W.2d 621, 631 (N.D.1977) [classification based upon sex denies equal protection], and *In Interest of G.H.,* 218 N.W.2d 441, 447 (N.D.1974) [denying a child the right to a free education because the child is handicapped violates equal protection and other State constitutional provisions].

Hanson argues that we should apply the strict level of scrutiny. As noted earlier, strict scrutiny tests will be applied when the classification involves a fundamental right or an inherently suspect class. Hanson argues that a fundamental interest is involved because the statute infringes upon one's right to remedy in our courts.

The Legislature has determined that persons in Hanson's circumstances are not entitled to a cause of action. The Legislature in effect has declared that the injuries suffered by this class of persons, while real, will not be legally recognized. There are many injuries without a legally recognized cause of action against anyone. *Stutts v. Ford Motor Co.,* 574 F.Supp. 100 (M.D. Tenn.1983); *Thornton v. Mono Mfg. Co.,* 99 Ill. App.3d 722, 54 Ill.Dec. 657, 425 N.E.2d 522 (1981); *Dague v. Piper Aircraft Corp.,* 275 Ind. 520, 418 N.E.2d 207 (1981); *Rosenberg v. Town of North Bergen,* 61 N.J. 190, 293 A.2d 662 (1972). *See also Whetham v. Bismarck Hospital,* 197 N.W.2d 678 (N.D.1972), in which we held that a mother was not entitled to recover damages for the mental anguish she suffered after witnessing her daughter's injury negligently caused by an employee of Bismarck Hospital.

The appropriate question is whether the right to this particular cause of action is a fundamental right. We are not alone in concluding that the right to recover for personal injuries is not a fundamental right. *Heath v. Sears, Roebuck Inc.,* 123 N.H. 512, 464 A.2d 288 (1983). Since the classification is not based upon race or some other immutable characteristic determined by the accident of birth, we hold that it is not a fundamental right. Accordingly, we do not apply the strict scrutiny standard of review in this case.

**10.** Ingram urges that we apply the rational basis test and cites us to several cases which have done so when scrutinizing a statute of repose. *Klein v. Catalano,* 386 Mass. 701, 437 N.E.2d 514, 522 (1982); *Lamb v. Wedgwood South Corp.,* 308 N.C. 419, 302 S.E.2d 868, 888 (1983); *Stutts v. Ford Motor Co.,* 574 F.Supp. 100, 105 (M.D.Tenn.1983); *Yarbro v. Hilton Hotels Corp.,* 655 P.2d 822, 825 (Colo.1983); *Thornton v.*

When applying the intermediate standard of review in *Johnson, supra,* we concluded that the North Dakota automobile guest statute was unconstitutional because it created an arbitrary distinction between paying and nonpaying guests which was not justified by the underlying purposes of the statute.

Shortly after our decision in *Johnson, supra,* we were again faced with an equal protection question in *Snyder's Drug Stores, Inc. v. North Dakota State Board of Pharmacy,* 219 N.W.2d 140 (N.D.1974).[11] When analyzing the equal protection claim, we refrained from applying the intermediate standard of review adopted in *Johnson, supra,* and, instead, applied the lower rational basis test. *Snyder's Drug Stores, supra* 219 N.W.2d at 150. We noted that "[s]tate legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality". *Snyder's Drug Stores, supra* 219 N.W.2d at 153. Applying the rational basis test under this presumption, we concluded that the pharmacy operating requirements of § 43–15–35(5), N.D.C.C., did not violate the due process and equal protection clauses of the State and Federal Constitutions.

In *Arneson, supra* 270 N.W.2d 125, we again looked at the three standards of review applicable when a statute is challenged on the basis of equal protection.[12] *Arneson* involved a challenge to a statute limiting "professional liability of qualifying health care providers to patients electing to be bound". *Arneson, supra* 270 N.W.2d at

126. We determined that the intermediate standard should be applied and, in doing so, concluded that the statute violated the equal protection provision of the North Dakota Constitution. *Arneson, supra* 270 N.W.2d at 136.

The intermediate standard of review was also applied in *Herman v. Magnuson,* 277 N.W.2d 445 (N.D.1979), and *Patch v. Sebelius,* 320 N.W.2d 511 (N.D.1982). In *Herman, supra,* we were presented with the question of whether or not the 90–day notice requirement regarding actions against municipalities for defective streets and bridges was violative of the equal protection clause of our State Constitution. When applying the intermediate standard, we concluded that the statute established "a close correspondence between the statutory classification and legislative goals" and was therefore constitutional. *Herman, supra* 277 N.W.2d at 454.

Before applying the intermediate standard of review in *Patch, supra* 320 N.W.2d at 513, we said:

"We begin with the well-established principle that an enactment of the Legislature is presumed to be valid. This presumption is conclusive unless it is clearly shown that the statute contravenes the State or Federal Constitution. [Citations omitted.] Moreover, if a statute is susceptible of two constructions, one of which would render it of doubtful constitutionality and one of which would not, the latter must be adopted."

We also said that, "It is well established that a legislative enactment is not unconsti-

---

*Mono Mfg. Co.,* 99 Ill.App.3d 722, 54 Ill.Dec. 657, 661, 425 N.E.2d 522, 526 (1981). Neither Ingram nor Hanson concede that the intermediate standard is the proper standard of review. However, both parties argue that they would be successful if the intermediate standard of review is applied.

**11.** *Snyder's Drug Stores, supra* 219 N.W.2d 140, came to us on remand from the United States Supreme Court. *North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc.,* 414 U.S. 156, 94 S.Ct. 407, 38 L.Ed.2d 379 (1973). In the first *Snyder's Drug Stores* case, being bound by *Liggett Co. v. Baldridge,* 278 U.S. 105, 49 S.Ct. 57, 73 L.Ed. 204 (1928), we held the requirements

to operate a pharmacy mandated by § 43–15–35(5), N.D.C.C., to be violative of the due process clause of the Federal Constitution: *Snyder's Drug Stores, Inc. v. North Dakota State Board of Pharmacy,* 202 N.W.2d 140 (N.D.1972). On appeal, the United States Supreme Court overruled *Liggett,* declaring it to be "a derelict in the stream of the law", and reversed our decision. 414 U.S. at 167, 94 S.Ct. at 414, 38 L.Ed.2d at 387.

**12.** Section 20 of the North Dakota Constitution referred to in *Arneson* was renumbered as Article I, § 21, in 1980, pursuant to § 46–03–11.1, N.D.C.C.

tutional merely because it is not all-embracing and does not attempt to cure all the evils within its reach". *Patch, supra* 320 N.W.2d at 514. In *Patch,* we concluded that a statute that conditioned a tort victim's right to recover from the state upon the state's purchase of liability insurance was constitutional under the intermediate level of review.

In the past we have not been able to establish a bright line test for determining when the rational basis test or the intermediate standard should apply. The rational basis test is most often applied in economic and social matters. The intermediate standard of review is usually applied when "an

important substantive right" is involved. *Heath, supra* 464 A.2d at 294.

█ While there are economic consequences for manufacturers and their insurers underlying the legislation in question, we believe our focus must be on the individuals affected. We are unwilling to view human life and safety as simply a matter of economics. Therefore, we agree with the New Hampshire Supreme Court that the right to recover for personal injuries is an important substantive right. *Heath, supra* 464 A.2d at 294.[13] We conclude that the appropriate standard of review to be applied in the present case is the intermediate standard or the close correspondence test.[14]

---

**13.** This is also consistent with *Herman, supra,* and *Patch, supra,* in which we applied the intermediate standard of review to statutes which affected one's right to recover for personal injuries.

**14.** Other courts have applied an intermediate standard of review when faced with an equal protection challenge to a statute of repose: *Berry v. Beech Aircraft Corp.,* 717 P.2d 670 (Utah 1985); *Heath, supra* 464 A.2d 288; *Lankford, supra* 416 So.2d 996; *Kennedy, supra* 471 A.2d 195. Because we are applying the standard of review applied in those cases, we believe a discussion of those cases is useful to an understanding of our holding today.

In *Berry, supra,* the Utah statute of repose stated that: "No action shall be brought ... more than six years after the date of initial purchase ... or ten years after the date of manufacture". Our statute provides that: "There shall be no recovery of damages ... unless the injury, death, or damage occurred within ten years of the date of the initial purchase ... or within eleven years of the date of manufacture." Under the Utah statute, a person injured one day before the end of the prescribed statutory period of time would have had only that day in which to file a claim. The statute of limitation normally granted to an injured person under those circumstances would be cut short. Under our statute, however, that person would be entitled to the full period of time prescribed in the statute of limitation. Our statute does not cut short the statute of limitation, *i.e.,* reduce the period of time in which an action may be brought, providing the injury occurs within the ten-year or eleven-year period, whichever is appropriate.

The Utah court refers to the following part of *Wilson v. Iseminger, supra* 185 U.S. 55, at 62, 22 S.Ct. 573 at 575, to suggest that the Utah statute of repose is unconstitutional because under certain circumstances it will not "allow a reason-

able time after a cause of action arises for the filing of an action":

"It may be properly conceded that all statutes of limitation must proceed on the idea that the party has full opportunity afforded him to try his right in the courts. A statute could not bar the existing rights of claimants without affording this opportunity; if it should attempt to do so, it would not be a statute of limitations, but an unlawful attempt to extinguish rights arbitrarily, whatever might be the purport of its provisions."

This requirement is not relevant to our statute of repose because, under our statute, if the injury occurs within the prescribed statutory period of time, the injured person still has the full time provided by the statute of limitation in which to bring an action.

The Utah court held that a legislature, when eliminating or restricting a cause of action, must provide "an effective and reasonable *alternative* remedy" [emphasis added]. We recognize that this differs somewhat from the view expressed on this subject in *Arneson v. Olson,* 270 N.W.2d 125, 135 (N.D.1978), wherein we stated:

"... while there need not always be a quid pro quo, any limitation or elimination of a pre-existing right may not be arbitrarily imposed."

We note that in *Duke Power Company v. Carolina Environmental Study Group,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), the United States Supreme Court may have left the issue of the need for a satisfactory alternative remedy, or a *"quid pro quo",* in some doubt. In applying the *"quid pro quo"* doctrine, the court noted:

"Initially, it is not at all clear that the Due Process Clause in fact requires that a legislatively enacted compensation scheme either duplicate the recovery at common law or provide a reasonable substitute remedy. However, we need not resolve this question here

*Classification*

The classification established by § 28–01.1–02, N.D.C.C., distinguishes between

since the Price-Anderson Act does, in our view, provide a reasonably just substitute for the common-law or state tort law remedies it replaces." *Duke Power Company, supra,* 438 U.S. at 88, 98 S.Ct. at 2638.

Another differing factor in *Berry, supra,* is that Utah has a state constitutional section providing that "[t]he right of action to recover damages for injuries resulting in death, shall never be abrogated". North Dakota has no corresponding state constitutional provision.

Finally, *Berry, supra,* differs from the case at hand in that Utah's statute of repose does not provide the exceptions which are available in § 28–01.1–02(3), N.D.C.C., which provides as follows:

"*28–01.1–02. Statute of limitation.*

. . . . .

"3. If a manufacturer, wholesaler, or retailer issues a recall of a product in any state, modifies a product, or becomes aware of any defect in a product at any time, and fails to notify or warn a user of the product who is subsequently injured or damaged as a result of the defect, the provisions of subsection 1 shall not bar any action against the manufacturer, wholesaler, or retailer based upon, or arising out of, the defect."

The Alabama case of *Lankford v. Sullivan, Long & Hagerty,* 416 So.2d 996 (Ala.1982), also has some features which differ from our case. Like Utah, the Alabama statute of repose focuses on the date upon which a cause of action must be brought and not the date of the injury. Also like Utah, the Alabama court advocates the *quid pro quo* concept: that the Legislature must provide an adequate substitute for any cause of action which it abolishes. In addition, the Alabama court distinguishes between a cause of action created by the Legislature and one created by the courts. In *Lankford,* the Alabama court applied a stricter standard of review because the legislation affected a common law cause of action as opposed to a legislatively created cause of action. This suggests that a cause of action created by the Legislature may be inherently less important than a cause of action created by the courts and appears to place the courts in a position superior to that of the Legislature in an area of policy making. We do not believe this philosophy can be adopted in North Dakota in light of § 1–01–06, N.D.C.C., which provides: "In this state there is no common law in any case where the law is declared by the code.", and our long application of this rule. *Kaylor v. Iseman Mobile Homes,* 369 N.W.2d 101, 103 (N.D.1985); *Wagner Bros., Inc. v. City of Williston,* 335 N.W.2d 328, 331 (N.D.1983); *Dorgan v. Kouba,* 274 N.W.2d 167, 169 (N.D.1979); *Anderson v. Blixt,* 72 N.W.2d 799, 807 (N.D.1955); *Reeves & Co. v. Russell,* 28

persons who are injured by a product that was initially purchased more than 10 years before or manufactured more than 11

N.D. 265, 148 N.W. 654, 659 (N.D.1914). Section 1–01–06 was first adopted in 1877, twelve years before our State Constitution, and has gone unaltered since that time. This illustrates the long established policy in our state that statutory law has precedence over the common law. Section 2 of the Transition Schedule, adopted along with our State Constitution in 1889, read:

"*Section 2.* All laws now in force in the territory of Dakota, which are not repugnant to this Constitution, shall remain in force until they expire by their own limitations or be altered or repealed."

There is nothing repugnant about § 1–01–06. For a case in which we resorted to territorial law to determine the meaning of our State Constitution, *see State v. Buehler,* 125 N.W.2d 155 (N.D.1963).

*Kennedy, supra* 471 A.2d 195, differs from this case for the reasons common to *Lankford* and *Berry, supra,* and also for other reasons. The Rhode Island Constitution, which guarantees "a certain remedy ... for all injuries", appears on its face to be broader than Article I, § 9, of the North Dakota Constitution. The Rhode Island statute of repose does not include exceptions equivalent to § 28–01.1–02(3).

We agree substantially with the analysis of the New Hampshire Supreme Court in *Heath, supra.* However, we must also recognize differing factors in that case. First, the New Hampshire Constitution has a provision virtually identical to the provision cited above in the Rhode Island Constitution. For this reason, it appears that the New Hampshire Constitution grants broader rights in insuring that its residents are "entitled to a certain remedy ... for all injuries" received. The New Hampshire statute of repose is also similar to the statutes of repose mentioned in the above cases in that it focuses on the date upon which a cause of action must be brought and not the date of the injury.

It should also be noted that the cases above cite to and in some instances partially rely upon *Batilla v. Allis Chalmers Mfg. Co.,* 392 So.2d 874 (Fla.1980), or *Overland Const. Co. v. Sirmons,* 369 So.2d 572 (Fla.1979), in which the Florida Supreme Court concluded that the statutes of repose deny access to the courts, and, thus, violated the open courts provision of Article I, § 21, of the Florida Constitution. Article I, § 21, of the Florida Constitution is virtually identical to Article I, § 9, of the North Dakota Constitution. The Florida Supreme Court, however, has "recede[d] from [those] decision[s]". *Pullum v. Cincinnati, Inc.,* 476 So.2d 657, 659 (Fla.1985). In *Pullum* the Florida Supreme Court held that a statute of repose did not violate Article I, § 21, of the Florida Constitution. *Pullum, supra* 476 So.2d at 659.

years before an injury, and those persons who are injured by a product which was purchased less than 10 years before or manufactured less than 11 years before an injury. The question, therefore, is whether or not there is such a close correspondence between this statutory classification and the legislative goals as would justify this classification. *Patch, supra* 320 N.W.2d at 513; *Herman, supra* 277 N.W.2d at 454.

The rationale of products liability statutes of repose are threefold:

"First, the fact that a product has been used safely for a substantial period of time is some indication that it was not defective at the time of delivery. Second, if a product seller is not aware of a claim, the passing of time may make it extremely difficult to construct a good defense because of the obstacle of securing evidence.... The third rationale is that persons ought to be allowed, as a matter of policy, to plan their affairs with a reasonable degree of certainty." Department of Commerce, Model Uniform Products Liability Act, Analysis § 110(B)(1), 44 Fed.Reg. 62,713, 62,734 (1979).

It is the third rationale which "goes to the heart of the product liability rate-setting problem", 44 Fed.Reg. at 62,734,[15] and which appears to have motivated the passage of the North Dakota Products Liability Act. This is indicated by the goal of the Legislature explained in § 28–01.1–01, N.D. C.C., which reads as follows:

"*28–01.1–01. Declaration of legislative findings and intent.*

"1. The legislative assembly finds that the number of lawsuits and claims for damages and the amount of judgments and settlements arising from defective products has substantially increased in recent years. Because of these increases, the insurance industry has drastically increased the cost of products liability insurance. The effect of increased insurance premiums and increased claims has increased product cost through manufacturers, wholesalers, and retailers passing the cost of premiums to the consumer. Certain product manufacturers are discouraged from continuing to provide and manufacture certain products because of the high cost and possible unavailability of products liability insurance.

"2. Because of these recent trends and for the purpose of alleviating the adverse effects which these trends are producing in the manufacturing industry, it is necessary to protect the public interest by enacting measures designed to encourage private insurance companies to continue to provide products liability insurance.

"3. It is the purpose of sections 28–01.-1–01 through 28–01.1–05 to provide a reasonable time within which actions may be commenced against manufacturers, while limiting the

---

15. The Department of Commerce made the following findings regarding the problem of uncertainty in product liability insurance:

"*Sec. 101. Findings*

"(A) Sharply rising product liability insurance premiums have created serious problems in commerce resulting in:

"(1) Increased prices of consumer and industrial products;

"(2) Disincentives for innovation and for the development of high-risk but potentially beneficial products;

"(3) An increase in the number of product sellers attempting to do business without product liability insurance coverage, thus jeopardizing both their continued existence and the availability of compensation to injured persons; and

"(4) Legislative initiatives enacted in a crisis atmosphere that may, as a result, unreasonably curtail the rights of product liability claimants.

"(B) One cause of these problems is that product liability law is fraught with uncertainty and sometimes reflects an imbalanced consideration of the interests it affects. The rules vary from jurisdiction to jurisdiction and are subject to rapid and substantial change. These facts militate against predictability of litigation outcome.

"(C) Insurers have cited this uncertainty and imbalance as justifications for setting rates and premiums that, in fact, may not reflect actual product risk or liability losses." 44 Fed.Reg. at 62,716.

time to a specific period for which products liability insurance premiums can be reasonably and accurately calculated; and to provide other procedural changes to expedite early evaluation and settlement of claims."

We do not question the Legislature's conclusion that there may have been a "crisis" facing North Dakota manufacturers because of unaffordable products liability insurance. We also recognize the importance of legislative action in attempting to alleviate this problem. We, however, question the solution. We are concerned about statutes which arbitrarily deny one class of persons important substantive rights to life and safety which are available to other persons.

■ Property rights ("economics") may often be affected by arbitrary time periods, e.g., ten-year and twenty-year statutes of limitation. But when we are dealing with human life and safety we believe that more is required for a justification than a reference to the economics of suppliers of goods. Some rational basis must be advanced for the selection of the period of years for "bar" or "repose", other than the economic interests of manufacturers or suppliers.

We agree with the following analysis by the Alabama Supreme Court, which suggests a less arbitrary means of reaching the legislative goals, in *Lankford, supra* 416 So.2d at 1003:

"The harshness of an absolute date-of-use limitation period is evident when compared to the Model Uniform Product Liability Act proposed by the Commerce Department. Section 110(B)(1) of the Act states:

'In claims that involve harm caused more than ten (10) years after time of delivery, a *presumption* arises that the harm was caused after the useful safe life had expired. This presumption may only be rebutted by clear and convincing evidence.' (Emphasis added.)

"The Model Act merely creates a presumption and does not provide for an absolute cut-off date."

■ While there certainly can be legislatively created classifications which bear a close correspondence to the legislative goals, i.e., *Herman v. Magnuson* and *Patch v. Sebelius, supra,* we can discern no such close correspondence between the classification created by § 28–01.1–02, N.D.C.C., and the stated legislative goals as would justify the unequal treatment wrought by this statute. *See Arneson, supra* 270 N.W.2d at 135; *Melland v. Johanneson,* 160 N.W.2d 107 (N.D.1968). Accordingly, we conclude that § 28–01.1–02, N.D.C.C., violates Article I, § 21, of the North Dakota Constitution.

### Conclusion

Having held that § 28–01.1–02, N.D.C.C., violates Article I, § 21, of the North Dakota Constitution, we reverse the decision of the district court and remand this case for trial.

MESCHKE and VANDE WALLE, JJ., concur.

LEVINE, Justice, specially concurring.

I agree that NDCC § 28–01.1–02 is unconstitutional. My review of the legislative history of § 28–01.1–02 leads me to conclude there is no close correspondence between the statute's classification and the Legislature's goals.

Though close correspondence may be "ill-defined," as Justice Stewart noted in another case on another subject, I know it when I see it. Here, after searching the record I simply do not see it.

Our statute was lifted from Utah (with the changes noted by Chief Justice Erickstad) before the Utah statute was held unconstitutional by that State's Supreme Court. On Senator Reiten's motion, the six-year period of repose contained in Utah's statute was enlarged in ours to ten years, clearly because of "testimony" that any defect in a product would surface within eight to ten years of its manufacture.

Minutes, North Dakota Legislative Council, Committee on Products Liability, October 6, 1978, p. 4. Were we applying a rational basis standard of review I would uphold the constitutionality of the statute even though the ten-year period applies indiscriminately to products with useful lives far exceeding ten years. Deference to the Legislature's reliance on the eight-to-ten-year timeline for defects to surface, would, in my view, sustain the statute.

However, under the intermediate level of scrutiny (which I agree applies to Hanson's important substantive right), we look "closely" at the correspondence between the statutory classification and legislative goals. *Herman v. Magnuson,* 277 N.W.2d 445 (N.D.1979). To me that means we exercise independent judgment in evaluating the closeness of the correspondence. *E.g., Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *City of Cleburne, Tex. v. Cleburne Living Center,* — U.S. ——, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); (Marshall, J., concurring and dissenting); *see also Arneson v. Olson,* 270 N.W.2d 125 (N.D.1978). I believe, under the heightened scrutiny we employ to evaluate the necessary correspondence, we approach the legislative classification "skeptically, with judgment suspended," *City of Cleburne, supra* 105 S.Ct. at 3271, notwithstanding language to the contrary in *Patch v. Sebelius,* 320 N.W.2d 511, 535 (N.D.1982), which I believe actually reflects a traditional rational basis analysis.

Unfortunately, the Legislative Council directed its concern over the constitutionality of NDCC § 28–01.1–02 only to due process considerations. Minutes, N.D.Leg.Council Comm. on Products Liability, January 30, 1978, p. 3. No thought was given to equal protection. Yet, it is clear that the Legislature cannot order action violative of equal protection and it cannot defer to the wishes of some fraction of the body politic if as a consequence of such deference there is a denial of equal protection.

While the goals of the Legislature in enacting this statute were to control rising product liability insurance rates, the interim committee was warned by the State Insurance Commissioner (the most, and probably the only, disinterested person giving testimony) that this bill would not alleviate the problem of increasing premiums because of the lack of information and the resultant uncertainty about insurance industry rate-making methods.

No one, at least no one testifying before the interim legislative committee working on NDCC § 28–01.1–02, was able to present data that established a close correspondence between eliminating claims for relief of persons injured by products after ten years from sale, and controlling the rising premiums for products liability insurance. There was little available data to assess the nature of the problem of rising premiums nationally or in North Dakota. It was suggested by the Insurance Department that if a problem existed in North Dakota, its resolution should be deferred until more information was available at the state level.

If we do not understand the causes of a problem, even conceding that a problem exists, I do not believe that legislation, which destroys the important substantive rights of a class of persons whose misfortune it was to be injured by a product over ten years old satisfies equal protection. There can be no close correspondence between a statutory classification such as we have here and a legislative objective when that objective is grounded on guesswork, frustration, and little more than a wing and a prayer.[1] Indeed, the Insurance Department further advised that even if there were knowledge and understanding of why costs were rising, the statute would not alleviate high premiums for North Dakota insureds because:

"Product liability rates are based on countrywide experience (because of statistical credibility), not North Dakota ex-

1. Unsuccessful effort was made to elicit information from a member of the Interagency Task Force who could not appear as scheduled. No rescheduling was effected. Minutes, N.D. Leg. Council Comm. on Products Liability, June 2, 1978, p. 2.

perience. Even if North Dakota experience were improved by the bill, North Dakota insureds would not see a reduction or tempering in increases in rates. Even if North Dakota experience were improved, that part of a North Dakota insured's claim experience which is based on suits outside of the state would not be affected by H.B. 1075, and thus would provide no basis for premium reduction.

"If every state had legislation similar to North Dakota's, premiums would not necessarily be substantially reduced overall. The bill addresses, or attempts to address, only the frequency component of rising claim costs, not the severity component of rising claim costs...." Minutes on H.B. 1075, Senate Industry, Business & Labor Committee (46th Leg. Assembly 1979).

The Legislature recognized it was working in the dark. At the same session it enacted H.B. 1075, it also enacted legislation requiring insurance companies to provide information relevant to rate-making procedures. H.B. 1076 (S.L.1979, ch. 340.) Presumably, that information will provide at least some of the data necessary for reasoned legislation. The Legislature jumped the gun by enacting NDCC § 28–01.1–02 to address a problem before uncovering the sources of that problem. I find no close correspondence justifying the statute's departure from equal treatment. Nor does the proposition that a Legislature need not cure all ills with one fell swoop, sustain the statute. *See Patch v. Sebelius, supra.* The problem here is not the Legislature's attempt to cure one segment of a perceived problem, it is the Legislature's failure to identify the causes of that problem. The attenuated relationship between the classification and the remedial goal does not, in my view, transcend the harm to the disadvantaged members of the class.

I therefore conclude NDCC § 28–01.1–02(1) violates Art. I, § 21, N.D. Const.

VANDE WALLE, J., concurs.

ERICKSTAD, Chief Justice, respectfully dissenting.

I agree basically with Justice Gierke's analysis of this case up to his analysis of the equal protection argument, except that I would broaden the background surrounding the adoption of Section 28–01.1–02, N.D.C.C., and because I would affirm the trial court on all issues, I would begin the discussion of the issues with the open courts issue. I would, for purposes of emphasis, also figuratively elevate Justice Gierke's footnote 7 to the body of my opinion, for it is partly upon the decisions cited therein that I rely for my view to affirm the trial court.

Proponents of the products liability bill, including representatives of the Wholesalers and Manufacturers Association, the National Federation of Independent Businesses, and various North Dakota manufacturers, argued before the legislative committees that the costs of products liability insurance had become unaffordable to many North Dakota manufacturers and that the statute of repose part of the bill was essential to carry out the intent of the bill—to reduce the costs of products liability insurance in North Dakota so that manufacturers could continue to make products at a competitive price, so employment could be maintained and so that manufacturers would not be tempted to do business without insurance which would leave potential claimants without a source of recovery for injuries received from defective products. It was also argued that the bill would prevent manufacturers from having to litigate claims when evidence is lost and memories have faded. Opponents, including the Insurance Commissioner, representatives of consumer groups, and the North Dakota Bar Association, argued that this part of the bill was unfair, and that it was certain to be declared unconstitutional by the courts. It was also argued that the bill could not accomplish its intended purpose, because products liability insurance rates were set on a national basis and any action

by one state attempting to reduce these rates would be futile.[1]

While the products liability bill was supported by a majority of the members of the interim Committee on Products Liability, a minority of the committee members strongly opposed the new "statute of limitation."

The minority members of the committee believed this part of the bill would unfairly limit the compensation available to innocent victims and questioned the constitutionality of such a provision. Governor Arthur A. Link, in his veto message, also questioned the fairness of this "statute of limitation." [2]

1. It is interesting to note that according to McGovern, *The Variety, Policy and Constitutionality of Product Liability Statutes of Repose,* 30 Am.U. L.Rev. 579, 632 (1981), 33 states had by then passed laws with similar provisions.

2. The arguments for and against products liability statutes of repose have been listed as follows:

"Proponents of statutes of repose contend that the most significant problem for industry in product liability actions is the long 'tail,' or period of potential liability, facing manufacturers and sellers of products. Permitting a person to bring a product liability action within an indefinite period of time after the product reaches the stream of commerce subjects the seller or manufacturer to potential liability for an unlimited time after his contact with the product has ended. Manufacturers favor statutes of repose because they eliminate the 'tail' problems of older products.

"Although the number of cases involving products over ten years old is relatively small, proponents of statutes of repose contend that their effect upon business planning and insurance ratemaking is significant and out of proportion to the number of cases that have arisen. Sellers are not able to set realistic prices on products because they cannot calculate either the potential product liability costs over the next fifty years or the cost of liability for products sold fifty years ago. Insurance ratemakers indicate that the lack of a sound basis for statistical analysis forces them to set rates by purely 'judgmental' reasoning. According to this argument, statutes of repose would provide greater certainty to both manufacturers and insurance companies and would reduce insurance premiums to meaningful cost-effective levels.

"A related economic argument for a statute of repose concerns the transaction costs of deciding product liability cases. The costs of litigating the small number of cases involving products over ten years old, for example, outweigh the benefits to plaintiffs who would recover in those cases. Legislation that draws inflexible time lines barring individual litigation will inevitably result in some inequity in cases arising close to those lines. Any linedrawing that causes such a result, however, cannot be justified on the basis of an analysis of a small number of difficult cases. Justification for a statute of repose should rest upon its effects on all product liability cases and all costs incurred. The litigation expenses that manufacturers would otherwise incur in defending actions involving older products would be calculated in the societal savings generated by the statute. Moreover, a statute of repose would contribute to judicial economy by reducing the number of cases on crowded judicial dockets. All of these benefits, according to this theory, would exceed the costs to a small number of plaintiffs.

"Another argument in favor of a statute of repose involves the speed of its effects. A statute of repose would immediately affect causes of action arising after the statute's effective date. The enactment of a statute of repose in product liability actions also would parallel reforms implemented in industries with similar problems, such as health care and construction.

"A statute of repose, therefore, has strong emotional appeal to industry: it bars claims immediately; it eliminates the perceived inequity of liability for old products; and, it is consistent with the solutions to similar problems found in other areas. Manufacturers have thus suggested that statutes of repose constitute the best single form of legislation to solve their perceived problems with product liability law. Their arguments note that: (1) management would be able to establish more cost-effective prices due to the greater predictability of financial losses from product design; (2) product liability insurance rates and transaction costs would be lowered; (3) an immediate effect would be experienced; and (4) greater equity would result.

"Critics of statutes of repose argue that: (1) their inflexibility produces harsh and inefficient results; (2) there would be little, if any, reduction of insurance premiums; (3) the benefits resulting from an immediate solution are outweighed by the need for both a more deliberate evolution of product liability theory and coordination with other proposed reforms; and (4) equity would not be served.

"These arguments suggest that statutes of repose would be unfair because they do not account for the extreme variety of consumer and workplace products, differences in the expected life of products, and the differences in short term and long term product defects. Moreover, there is too much diversity among the types of injuries caused by defective products to support a single, inflexible time period for liability. Although a statute of repose certainly would reduce recoveries by persons

*Constitutional Questions*

In challenging the constitutionality of 28–01.1–02, Hanson relies heavily upon Article I, Section 9, of the North Dakota Constitution which reads, in pertinent part:

"*Section 9.* All courts shall be open, and every man for any injury done him in his lands, goods, person or reputation shall have remedy by due process of law, and right and justice administered without sale, denial or delay."

Hanson also refers to the following part of the Fifth Amendment to the United States Constitution:

"No person shall ... be deprived of life, liberty, or property, without due process of law;"

and Section 1 of the Fourteenth Amendment to the United States Constitution which, in pertinent part, reads:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

While Hanson's argument is directed primarily to Article I, Section 9, of the North Dakota Constitution, she also makes equal protection and due process challenges when presenting her argument.[3]

*Article I, Section 9*

In my view, 28–01.1–02 is not violative of Article I, Section 9, of our state constitution. I realize that some courts have construed state constitutional open court provisions as guaranteeing a remedy for every injury incurred.[4] I do not agree with this broad view of such a constitutional provision. My research shows that the part of Article I, Section 9, relied upon by Hanson has been repeatedly construed as a guarantee of access to our state system of justice. *Three Affiliated Tribes v. Wold Engineering*, 364 N.W.2d 98, 104 (N.D.1985), *cert. granted*, — U.S. —, 106 S.Ct. 270, 88 L.Ed.2d 224 (1985); *Gourneau v. Smith*, 207 N.W.2d 256, 259 (N.D.1973); *State v. Watland*, 51 N.D. 710, 201 N.W. 680 (1924); *Malin v. LaMoure County*, 27 N.D. 140, 145 N.W. 582 (1914). But, even if a broader interpretation of this clause were possible, it has never been construed as an absolute right. *Andrews v. O'Hearn, M.D.*, 387 N.W.2d 716 (N.D.1986). This is

---

injured by products, there may not be a corresponding reduction in insurance premium rates. An eight- to ten-year statute of repose, for example, would be too long to improve the predictability of insurance claims. In addition, critics of statutes of repose contend that the 'tail' problem cited by industry is grossly overstated." [Footnotes omitted.] 30 Am.U.L. Rev. at 593–95.

3. We have said, when a person wishes to raise a constitutional issue he "should bring up his heavy artillery or forego the attack entirely." *Jones v. North Dakota Workmen's Compensation Bureau*, 334 N.W.2d 188, 192 (N.D.1983); *State v. Hagstrom*, 274 N.W.2d 197, 200 (N.D.1979); *So. Valley Grain Dealers v. Board of County Com'rs*, 257 N.W.2d 425, 434 (N.D.1977). Notwithstanding that the heavy artillery may be missing, I acknowledge the existence of certain state constitutional provisions.

 The North Dakota constitutional provision guaranteeing equal protection of the laws is Article I, Section 21, which reads:

 "*Section 21.* No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legisla-

tive assembly; nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens."

 The following part of Article I, Section 12, of the North Dakota Constitution guarantees due process of law:

 "No person shall ... be deprived of life, liberty or property without due process of law."

4. Some courts appear to do so based on state constitutional provisions which are worded significantly broader than Article I, Section 9, of our state constitution. *Kennedy v. Cumberland Engineering Co., Inc.*, 471 A.2d 195, 197 (R.I. 1984); *Heath v. Sears, Roebuck & Co.*, 123 N.H. 512, 464 A.2d 288, 294 (1983). *See* footnote 14. Other courts, however, have used state constitutional provisions which are virtually the same as Article I, Section 9, to guarantee someone a right to a cause of action for every conceivable injury. *Daugaard v. Baltic Co-op. Bldg. Supply Ass'n*, 349 N.W.2d 419, 424–26 (S.D.1984). *See* vigorous dissent by J. Wollman questioning whether the life span of the majority opinion would be "as ephemeral as the composition of the court that produced it." 349 N.W.2d at 428.

supported by North Dakota cases which suggest that Article I, Section 9, is intertwined with due process protections. *Hjelle v. Sornsin Construction Company*, 173 N.W.2d 431 (N.D.1970); *Neer v. State Live Stock Sanitary Board*, 40 N.D. 340, 168 N.W. 601 (1918); *Trustee Loan Co. v. Botz*, 37 N.D. 230, 164 N.W. 14 (1917). More recently in *Andrews v. O'Hearn*, our Court said:

"The non-absolute character of Section 9 is readily apparent by a review of this court's decisions interpreting that section as not requiring a remedy for every alleged wrong. And, although this court has, on occasion, used this provision of the North Dakota Constitution to correct a substantive error, we do not believe that Section 9 was intended to promote this court to the position of a super-legislature in charge of ensuring perfect justice and complete remedies...." [Footnotes omitted.] 387 N.W.2d at 723.

I believe Article I, Section 9, of the North Dakota Constitution should be viewed as "a mandate to the judiciary, and not as a limitation on the legislature." *Stutts v. Ford Motor Co.*, 574 F.Supp. at 103; *Thornton v. Mono Mfg. Co.*, 54 Ill.Dec. at 661, 425 N.E.2d at 526; *Harrison v. Schrader*, 569 S.W.2d 822, 827 (Tenn.1978), 16D C.J.S. *Constitutional Law*, § 1429(b) 686 (1985). I do not believe Article I, Section 9, should be used to guarantee a court-created remedy under any and all circumstances. When the legislature has specifically abolished or limited a cause of action, we should not use Article I, Section 9, to recreate the cause of action.

My position is very well stated by the Supreme Court of Massachusetts when upholding a statute which contained a statute of repose in actions against architects and building contractors. I quote:

" 'Societal conditions occasionally require the law to change in a way that denies a plaintiff a cause of action available in an earlier day.... This court would en-

croach upon the Legislature's ability to guide the development of the law if we invalidated legislation simply because the rule enacted by the Legislature rejects some cause of action currently preferred by the courts. To do so would be to place certain rules of the "common law" and certain non-constitutional decisions of the courts above all change except by constitutional amendment. Such a result would offend our notion of the checks and balances between the various branches of government, and the flexibility required for the healthy growth of the law.' *Freezer Storage, Inc. v. Armstrong Cork Co.*, 476 Pa. 270, 280–281, 382 A.2d 715 (1978)." [Other citations omitted.] *Klein v. Catalano*, 386 Mass. 701, 437 N.E.2d 514, 522 (1982).

The natural result of my position is that the legislature may abolish a previously legally recognized cause of action without providing a *quid pro quo* so long as the abolished cause of action is not guaranteed by our federal or state constitutions and the abolition does not offend either of them. *Silver v. Silver*, 280 U.S. 117, 122, 50 S.Ct. 57, 58, 74 L.Ed. 221, 225 (1929); *Arneson v. Olson*, 270 N.W.2d 125, 135 (N.D.1978). Obviously then, the legislature may also place constitutionally allowable limitations upon a legally recognized cause of action.

Although Hanson has suggested, and the Utah and Alabama courts have concluded,[5] that the legislature may not abolish an already existing cause of action without a *quid pro quo*, I am not convinced of the correctness of this reasoning because of the effect it would have on the ability of our legislature to change our laws to adjust to the necessities of the times.

I conclude that Section 28–01.1–02, N.D. C.C., is not violative of Article I, Section 9, of our state constitution.

### *Equal Protection*

As I have concluded that Article I, Section 9, does not preclude the legislature

---

5. *See, Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985); *Lankford v. Sullivan, Long & Hag-* *erty*, 416 So.2d 996 (Ala.1982).

from placing limitations upon causes of action, I must now determine whether or not the limitations imposed by 28–01.1–02 are consistent with other provisions of our state constitution. I will first review 28–01.1–02 under the equal protection clause of our state constitution, Article I, Section 21.

Before considering that question, however, it is important to decide what standard of review we should apply.

Here, some of what I say may appear to be repetitious of what Justice Gierke has said on this subject. That is explained by the fact that he has borrowed from my proposed majority opinion with my approval. It is important for continuity of thought to restate my views here, especially as we differ from time to time in the conclusions we draw.

### Scope of Review

#### I

In *Johnson v. Hassett*, 217 N.W.2d 771 (N.D.1974), we spoke of the three levels of scrutiny applicable when a statute is challenged on the basis of equal protection. The highest level of scrutiny, strict scrutiny, is applied to cases involving "inherently suspect" or "fundamental interest" classifications. *Johnson v. Hassett*, 217 N.W.2d at 775. Inherently suspect classifications include classifications based upon race, sex, national origin, illegitimacy, or other immutable characteristics determined solely by accident of birth. *State ex rel. Olson v. Maxwell*, 259 N.W.2d 621, 627 (N.D.1977); *Johnson v. Hassett*, 217 N.W.2d at 775. The lowest level of scrutiny is applied when

non-suspect classifications are involved. Under this level of scrutiny, a legislative classification will be sustained unless it is patently arbitrary and bears no rational relationship to a legitimate governmental interest. *Johnson v. Hassett, id.; Arneson v. Olson*, 270 N.W.2d at 133. The third level of scrutiny, which is "less clearly defined," is an intermediate analysis located between the strict scrutiny test and the rational relationship test. When applying this test, there must be a "close correspondence between statutory classification and legislative goals." *Arneson v. Olson*, 270 N.W.2d at 133; *Johnson v. Hassett*, 217 N.W.2d at 775. In recognizing the existence of an intermediate standard, we have complicated our analysis and reduced the help we could otherwise receive from the United States Supreme Court and most of the highest courts of other states which seem to recognize, with limited exceptions, only the other two standards of review.[6]

#### II

When applying the intermediate level of scrutiny in *Johnson v. Hassett*, we concluded that the North Dakota automobile guest statute was unconstitutional because it created an arbitrary distinction between paying and nonpaying guests which was not justified by the purposes of the statute.

Shortly after our decision in *Johnson v. Hassett*, we were again faced with an equal protection question in *Snyder's Drug Store, Inc. v. North Dakota State Board of Pharmacy*, 219 N.W.2d 140 (N.D.1974).[7] When analyzing the equal protection claim,

---

6. *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. ——, ——, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313, 320–21 (1985); *Plyler v. Doe*, 457 U.S. 202, 217–18, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786, 799–800 (1982); *Pullum v. Cincinnati, Inc.*, 476 So.2d 657; *Tetterton v. Long Mfg. Co., Inc.*, 332 S.E.2d 67; *Davis v. Whiting Corp.*, 674 P.2d 1194; *Colton v. Dewey*, 212 Neb. 126, 321 N.W.2d 913 (1982); *Rosenberg v. Town of North Bergen*, 61 N.J. 190, 293 A.2d 662.

7. *Snyder's Drug Stores*, 219 N.W.2d 140, came to us on remand from the United States Supreme Court. *North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc.*, 414 U.S. 156, 94

S.Ct. 407, 38 L.Ed.2d 379 (1973). In the first *Snyder's Drug Stores* case, being bound by *Liggett Co. v. Baldridge*, 278 U.S. 105, 49 S.Ct. 57, 73 L.Ed. 204 (1928), we held the requirements to operate a pharmacy mandated by § 43–15–35(5), N.D.C.C., to be violative of the due process clause of the federal constitution. *Snyder's Drug Stores, Inc. v. North Dakota State Board of Pharmacy*, 202 N.W.2d 140 (N.D.1972). On appeal, the United States Supreme Court overruled *Liggett*, declaring it to be "a derelict in the stream of the law," and reversed our decision. 414 U.S. at 167, 94 S.Ct. at 414, 38 L.Ed.2d at 387.

we refrained from applying the intermediate standard of scrutiny adopted in *Johnson v. Hassett,* and instead applied the lower rational relationship standard. *Snyder's Drug Stores,* 219 N.W.2d at 150. We noted that "[s]tate legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality." 219 N.W.2d at 153. Applying the reasonable relation test under this presumption, we concluded that the pharmacy operating requirements of Section 43–15–35(5), N.D.C.C., did not violate the due process or equal protection clauses of the state and federal constitutions.

In *Arneson v. Olson,* 270 N.W.2d 125, we again explained the three levels of scrutiny applicable when a statute is challenged on the basis of equal protection. Among other things, *Arneson* involved a challenge to a statute limiting "professional liability of qualifying health care providers to patients electing to be bound." *Arneson v. Olson,* 270 N.W.2d at 126. We determined that the intermediate level of scrutiny should be applied and, in doing so, concluded that the statute violated the equal protection provision of the North Dakota Constitution. 270 N.W.2d at 136.

We again applied the intermediate standard of scrutiny in *Herman v. Magnuson,* 277 N.W.2d 445 (N.D.1979), and *Patch v. Sebelius,* 320 N.W.2d 511 (N.D.1982). In *Herman* we were presented with the question of whether or not the 90-day notice requirement in actions against municipalities for defective streets and bridges was violative of the equal protection clause of our state constitution. When applying the intermediate standard, we concluded that the statute established "a close correspondence between the statutory classification and legislative goals" and was therefore constitutional. 277 N.W.2d at 454.

Before applying the intermediate standard of scrutiny in *Patch,* we said:

"We begin with the well-established principle that an enactment of the Legislature is presumed to be valid. This presumption is conclusive unless it is clearly shown that the statute contravenes the State or Federal Constitution. Moreover, if a statute is susceptible of two constructions, one of which would render it of doubtful constitutionality and one of which would not, the latter must be adopted." [Citations omitted.] 320 N.W.2d at 513.

We also said that, "It is well established that a legislative enactment is not unconstitutional merely because it is not all-embracing and does not attempt to cure all the evils within its reach." 320 N.W.2d at 514. In *Patch,* we concluded that a statute that conditioned a tort victim's right to recover from the state upon the state's purchase of liability insurance was constitutional under the intermediate level of scrutiny.

Cases in which we have applied strict scrutiny include *State ex rel. Olson v. Maxwell,* 259 N.W.2d at 631 (classification based upon sex denies equal protection), and *In Interest of G.H.,* 218 N.W.2d 441, 447 (N.D.1974) (denying a child the right to a free education because the child is handicapped violates equal protection and other state constitutional provisions.)

III

Keeping in mind the above cases in which we applied one of the three levels of scrutiny applicable in equal protection cases, it must now be determined which level of scrutiny should be applied in the case at hand. Hanson argues that we should apply the strict level of scrutiny. As noted earlier, strict scrutiny tests will be applied when the classification involves a fundamental right or an inherently suspect class. Hanson argues that a fundamental interest is involved because the statute infringes upon one's right to remedy in our courts. I do not agree with this contention.

Hanson's right to access to the courts and right to seek a remedy for a legally recognized claim has not been infringed by this statute. The legislature has determined instead that persons in her classification do not have a claim recognized by law. The legislature in effect has determined

that the injuries suffered by this class of persons, while real, will not be legally recognized.[8] The appropriate question, therefore, is not whether or not the right to seek a remedy in the courts for a legally recognized cause of action is a fundamental right, but whether or not the right to seek a remedy in the courts for this particular cause of action is a fundamental right. I believe that it is not.[9] Accordingly, I would not apply the strict scrutiny standard of review in this case.

Ingram urges that we apply the rational basis test and refers us to several cases which have done so when faced with an equal protection challenge to a statute of repose.[10] Neither Ingram nor Hanson concede that the intermediate standard is the proper scope of review. However, both parties argued that they would be successful if the intermediate standard of review were to be applied.

In the past, we have determined the appropriateness of applying the intermediate standard of scrutiny in a case-by-case method. Although we have not been able to establish a bright line test for determining when the rational basis test or the intermediate standard should apply, we recognize the importance of consistency and predictability. Accordingly, I agree with Justice Gierke when he asserts that the intermediate standard of review should apply when "an important substantive right" is involved. *Heath v. Sears, Roebuck & Co.,* 464 A.2d at 294. I agree with the New Hampshire Supreme Court that the right to recover for personal injuries is an impor-

tant substantive right. *Heath,* 464 A.2d at 294.

It is at this point that my views cause me to depart from Justice Gierke's views and lead me ultimately to a different result. The right involved in this case is an economic right; it is a right more closely related to those rights which are usually examined under the rational basis standard than those rights which are usually examined under the strict scrutiny standard. *Nygaard v. Robinson,* 341 N.W.2d 349, 358–59 (N.D.1983). I shall lean accordingly in my analysis. *See,* McGovern, *The Variety, Policy and Constitutionality of Product Liability Statutes of Repose,* 30 Am.U.L. Rev. at 607–608.

I recognize that a majority of the state courts under their own constitution, when addressing this issue, have applied the rational basis test. My research also indicates that federal courts have consistently applied the rational basis test when analyzing equal protection challenges to products liability statutes of repose under the United States Constitution. *Hartford Fire Ins. v. Lawrence, Dykes, Goodenberger,* 740 F.2d 1362 (6th Cir.1984); *Barwick v. Celotex Corp.,* 736 F.2d 946 (4th Cir.1984); *Wayne v. Tennessee Valley Authority,* 730 F.2d 392 (5th Cir.1984) *cert. denied,* —— U.S. —— 105 S.Ct. 908, 83 L.Ed.2d 922 (1985); *Braswell v. Flintkote Mines, Ltd.,* 723 F.2d 527 (7th Cir.1983) *cert. denied,* 467 U.S. 1231, 104 S.Ct. 2690, 81 L.Ed.2d 884 (1984); *Mathis v. Eli Lilly and Co.,* 719 F.2d 134 (6th Cir.1983); *Dague v. Piper Aircraft Corp.,* 513 F.Supp. 19 (N.D.Ind.

---

**8.** The possibility of having an injury without being entitled to a legally recognized cause of action is certainly not a novel concept. *Stutts v. Ford Motor Co.,* 574 F.Supp. 100 (M.D.Tenn. 1983); *Lamb v. Wedgewood South Corp.,* 308 N.C. 419, 302 S.E.2d 868 (1983); *Thornton v. Mono Mfg. Co.,* 99 Ill.App.3d 722, 54 Ill.Dec. 657, 425 N.E.2d 522 (1981); *Dague v. Piper Aircraft Corp.,* 275 Ind. 520, 418 N.E.2d 207 (1981); *Rosenberg v. Town of North Bergen,* 293 A.2d 662 (N.J.1972). *See also, Whetham v. Bismarck Hospital,* 197 N.W.2d 678 (N.D.1972), in which we held that a mother was not entitled to recover damages for the mental anguish she suffered after witnessing her daughter's injury negligently caused by an employee of Bismarck Hospital.

**9.** It has been held that the right to recover for personal injuries is not a fundamental right. *Heath v. Sears, Roebuck & Co.,* 123 N.H. 512, 464 A.2d 288 (1983).

**10.** *Klein v. Catalano,* 386 Mass. 701, 437 N.E.2d 514, 522 (1982); *Lamb v. Wedgewood South Corp.,* 308 N.C. 419, 302 S.E.2d 868, 888 (1983); *Stutts v. Ford Motor Co.,* 574 F.Supp. 100, 105 (N.D.Tenn.1983); *Yarbro v. Hilton Hotels Corp.,* 655 P.2d 822, 825 (Colo.1983); *Thornton v. Mono Mfg. Co.,* 99 Ill.App.3d 722, 54 Ill.Dec. 657, 661, 425 N.E.2d 522, 526 (1981).

1980). Applying the intermediate standard of review to 28–01.1–02 is justified under our state constitution because it is in accord with previous decisions in which we have consistently applied the intermediate standard of review to statutes which affected one's right to recover for personal injuries. *Patch v. Sebelius, Herman v. Magnuson, Arneson v. Olson, Johnson v. Hassett.*

## IV

While a majority of the courts appear to apply the rational basis test and when so doing usually reach the conclusion that the statutes of repose of their states are constitutional, several courts have applied an intermediate standard of review when faced with an equal protection challenge and when so doing reach the conclusion that the statutes of repose of their states are unconstitutional. *Berry v. Beech Aircraft, Corp.,* 717 P.2d 670 (Utah 1985); *Heath v. Sears, Roebuck & Co.,* 464 A.2d 288; *Lankford v. Sullivan, Long & Hagerty,* 416 So.2d 996; *Kennedy v. Cumberland Engineering Co. Inc.,* 471 A.2d 195. Because I would apply the intermediate standard of review but reach a different result, I believe a discussion of those cases is important to an appropriate understanding of my views. Those cases are clearly distinguishable. I acknowledge that Justice Gierke has said in his footnote 14 what I will now emphasize by elevating to the body of my opinion.

Let me first consider *Berry v. Beech Aircraft,* 717 P.2d 670. The Utah statute of repose states that: "No action shall be brought ... more than six years after the date of initial purchase ... or ten years after the date of manufacture." Our statute provides that: "There shall be no recovery of damages ... unless the injury, death, or damage occurred within ten years of the date of initial purchase ... or within eleven years of the date of manufacture." Under the Utah statute, a person injured

one day before the end of the prescribed statutory period of time would have had only that day in which to file a claim. The statute of limitation normally granted to an injured person under those circumstances would be cut short. Under our statute, however, that person would be entitled to the full period of time prescribed in the statute of limitation. Our statute does not cut short the statute of limitation; *i.e.,* reduce the period of time in which an action may be brought providing the injury occurs within the ten- or eleven-year period, whichever is appropriate.

The Utah court refers to the following part of *Wilson v. Iseminger,* 185 U.S. at 62, 22 S.Ct. at 575, 46 L.Ed. at 807 to suggest that the Utah statute of repose is unconstitutional because under certain circumstances it will not "allow a reasonable time after a cause of action arises for the filing of an action:"

> "It may be properly conceded that all statutes of limitation must proceed on the idea that the party has full opportunity afforded him to try his right in the courts. A statute could not bar the existing rights of claimants without affording this opportunity; if it should attempt to do so, it would not be a statute of limitations, but an unlawful attempt to extinguish rights arbitrarily, whatever might be the purport of its provisions."

This requirement is not relevant to our statute of repose because, under our statute, if the injury occurs within the prescribed statutory period of time, the injured person still has the full time provided by the statute of limitation in which to bring an action.

I also do not agree with the Utah Court that a legislature, when eliminating or restricting a cause of action, must provide "an effective and reasonable *alternative* remedy." [Emphasis added.] In saying this, I recognize that I may be taking a position contrary to our view expressed on this subject in *Arneson v. Olson.*[11] If this

11. In *Arneson,* we stated:
"... while there need not always be a quid pro quo, any limitation or elimination of a

pre-existing right may not be arbitrarily imposed." 270 N.W.2d at 135.

view were followed in North Dakota, I believe it would infringe upon the legislature's constitutional authority to create and eliminate causes of action. My view of the significance of the state constitution as to this issue is consistent with the view of the United States Supreme Court of the significance of the United States Constitution in *Silver v. Silver*, 280 U.S. at 122, 50 S.Ct. at 58, 74 L.Ed. at 225:

> "We need not, therefore, elaborate the rule that the Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object."

Another distinguishing factor in *Berry v. Beech Aircraft* is that Utah has a state constitutional section providing that "[t]he right of action to recover damages for injuries resulting in death, shall never be abrogated." North Dakota has no corresponding state constitutional provision.

Finally, *Berry v. Beech Aircraft*, is distinguishable from the case at hand in that Utah's statute of repose does not provide the exceptions which are available in Section 28–01.1–02(3), N.D.C.C.[12] In *Berry*, the Utah Court distinguished the Nebraska decisions, which held statutes of repose constitutional, on the basis that the Nebraska Supreme Court had "created judicial exceptions to mitigate the harsh effects of such statutes." *See Berry v. Beech Aircraft*, n. 9. The Nebraska Court, in *MacMillen v. A.H. Robins Co., Inc.*, 217 Neb. 338, 348 N.W.2d 869 (1984), held the Nebraska products liability statute of re-

pose inapplicable where the manufacturer fraudulently refused to warn of known hazards caused by the Dalkon Shield. This exception exists in North Dakota in 28–01.-1–02(3).

The Alabama case of *Lankford v. Sullivan, Long & Hagerty*, 416 So.2d 996, also has some features which distinguish it from our case. Like Utah, the Alabama statute of repose focuses on the date upon which a cause of action must be brought and not the date of the injury. Also like Utah, the Alabama court advocates the *quid pro quo* concept; that the legislature must provide an adequate substitute for any cause of action which it abolishes. In addition, and what I find disturbing, is the Alabama court's distinction between a cause of action created by the legislature and one created by the courts. In *Lankford*, the Alabama court applied a stricter standard of review because the legislation affected a common law cause of action as opposed to a legislatively created cause of action. This suggests that a cause of action created by the legislature is inherently less important than a cause of action created by the courts and appears to place the courts in a position superior to that of the legislature in an area of policy making. I do not believe this philosophy can be adopted in North Dakota in light of Section 1–01–06, N.D.C.C., which reads: "In this state there is no common law in any case where the law is declared by the code," [13] and our long application of this rule. *Kaylor v. Iseman Mobile Homes*, 369 N.W.2d 101, 103 (N.D.1985); *Wagner Bros., Inc. v.*

---

**12.** Section 28–01.1–02(3), N.D.C.C., provides as follows:

> "3. If a manufacturer, wholesaler, or retailer issues a recall of a product in any state, modifies a product, or becomes aware of any defect in a product at any time, and fails to notify or warn a user of the product who is subsequently injured or damaged as a result of the defect, the provisions of subsection 1 shall not bar any action against the manufacturer, wholesaler, or retailer based upon, or arising out of, the defect."

**13.** Section 1–01–06 was first adopted in 1877, two years before our state constitution, and has gone unaltered since that time. This illustrates

the long established policy in our state that statutory law has precedence over the common law. Section 2 of the Transition Schedule, adopted along with our state constitution in 1889, reads:

> "*Section 2.* All laws now in force in the territory of Dakota, which are not repugnant to this Constitution, shall remain in force until they expire by their own limitations or be altered or repealed."

There is nothing repugnant about Section 1–01–06. For a case in which we resorted to territorial law to determine the meaning of our state constitution, *see State v. Buehler*, 125 N.W.2d 155 (N.D.1963).

*City of Williston,* 335 N.W.2d 328, 331 (N.D.1983); *Dorgan v. Kouba,* 274 N.W.2d 167, 169 (N.D.1979); *Anderson v. Blixt,* 72 N.W.2d 799, 807 (N.D.1955); *Reeves & Co. v. Russell,* 28 N.D. 265, 148 N.W. 654, 659 (1914).

*Kennedy v. Cumberland Engineering,* 471 A.2d 195, is distinguishable for the reasons common to *Lankford* and *Berry,* and also for other reasons. First, the Rhode Island Constitution,[14] which guarantees "a certain remedy ... for all injuries," appears on its face to be broader than Article I, Section 9, of the North Dakota Constitution. It also appears to grant substantive rights of recovery for every injury. As I noted earlier in this opinion, Article I, Section 9, has been repeatedly construed as guaranteeing access to our state system of justice, but has never been construed as granting an absolute right to a remedy for all injuries. Finally, the Rhode Island statute of repose does not include exceptions equivalent to 28–01.1–02(3). *See* footnote 12. The Rhode Island Supreme Court recognized the importance of the absence of such exceptions in the Rhode Island statute when stating:

> "[P]laintiffs would be barred from recovery because they were injured by products that continually injured people because of defective designs or construction when the manufacturers determine it more economical to allow the product to stay in the field of commerce until the ten-year bar applies than to correct the defect." 471 A.2d at 200.

I also find distinguishing factors in *Heath v. Sears, Roebuck & Co.,* 464 A.2d 288. First, the New Hampshire Constitution has a provision virtually identical to the provision cited above in the Rhode Island Constitution. *See* footnote 14. For this reason, it appears that the New Hampshire Constitution grants broader rights in insuring that its residents are "entitled to a certain remedy ... for all injuries" received. The New Hampshire statute of repose is also similar to the statutes of repose mentioned in the above cases in that it focuses on the date upon which a cause of action must be brought and not the date of the injury.

It should also be noted that the foregoing cases refer to, and in some instances partially rely upon, *Batilla v. Allis Chalmers Mfg. Co.,* 392 So.2d 874 (Fla.1980), or *Overland Const. Co. v. Sirmons,* 369 So.2d 572 (Fla.1979), in which the Florida Supreme Court concluded that the statutes of repose denied access to the courts, and thus violated the open courts provision of Article I, Section 21, of the Florida Constitution. Article I, Section 21, of the Florida Constitution is virtually identical to Article I, Section 9, of the North Dakota Constitution. The Florida Supreme Court, however, has "recede[d] from [those] decision[s]." *Pullum v. Cincinnatti, Inc.,* 476 So.2d 657, 659 (Fla.1985). In *Pullum* the Florida Supreme Court held that a statute of repose did not violate Article I, Section 21, of the Florida Constitution. 476 So.2d at 659.

### Classification

What follows under this heading and the next will be similar to what Justice Gierke has said at pages 11–13 of his opinion. This he has borrowed again with my approval from my proposed majority opinion. I repeat it here for continuity of thought and as a lead into my analysis of the close correspondence issue.

The classification established by 28–01.1–02 distinguishes between persons who are injured by a product that was initially purchased more than 10 years before or manufactured more than 11 years before an injury, and those persons who are injured by a product which was purchased less

---

**14.** Article I, Section 5, of the Rhode Island Constitution reads:

"§ 5. Remedies for wrongs—Right to justice.—Every person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property, or character. He ought to obtain right and justice freely and without purchase, completely and without denial; promptly and without delay; conformably to the laws."

than 10 years before or manufactured less than 11 years before an injury. The question, therefore, is whether or not there is such a close correspondence between this statutory classification and the legislative goals as would justify this classification. *Patch v. Sebelius,* 320 N.W.2d at 513; *Herman v. Magnuson,* 277 N.W.2d at 454.

### Analysis of Close Correspondence

The rationale of products liability statutes of repose are threefold:

"First, the fact that a product has been used safely for a substantial period of time is some indication that it was not defective at the time of delivery. Second, if a product seller is not aware of a claim, the passing of time may make it extremely difficult to construct a good defense because of the obstacle of securing evidence.... The third rationale is that persons ought to be allowed, as a matter of policy, to plan their affairs with a reasonable degree of certainty." Department of Commerce, Model Uniform Product Liability Act, Analysis § 110(B)(1), 44 Fed.Reg. 62,713, 62,734 (1979).

It is this third rationale which "goes to the heart of the product liability rate-setting problem," 44 Fed.Reg. at 62,734,[15] and which appears to have motivated the passage of the North Dakota Products Liability Act. This is indicated by the goals of the legislature explained in Section 28–01.-1–01, N.D.C.C., "Declaration of legislative findings and intent," which reads:

"1. The legislative assembly finds that the number of lawsuits and claims for damages and the amount of judgments and settlements arising from defective products has substantially increased in recent years. Because of these increases, the insurance industry has drastically increased the cost of products liability insurance. The effect of increased insurance premiums and increased claims has increased product cost through manufacturers, wholesalers, and retailers passing the cost of premiums to the consumer. Certain product manufacturers are discouraged from continuing to provide and manufacture certain products because of the high cost and possible unavailability of products liability insurance.

"2. Because of these recent trends, and for the purpose of alleviating the adverse effects which these trends are producing in the manufacturing industry, it is necessary to protect the public interest by enacting measures designed to encourage private insurance companies to continue to provide products liability insurance.

"3. It is the purpose of sections 28–01.-1–01 through 28–01.1–05 to provide a reasonable time within which actions may be commenced against manufacturers, while limiting the time to a specific period for which

---

**15.** The Department of Commerce made the following findings regarding the problem of uncertainty in products liability insurance:

"*Sec. 101. Findings*

"(A) Sharply rising product liability insurance premiums have created serious problems in commerce resulting in:

(1) Increased prices of consumer and industrial products;

(2) Disincentives for innovation and for the development of high-risk but potentially beneficial products;

(3) An increase in the number of product sellers attempting to do business without product liability insurance coverage, thus jeopardizing both their continued existence and the availability of compensation to injured persons; and

(4) Legislative initiatives enacted in a crisis atmosphere that may, as a result, unreasonably curtail the rights of product liability claimants.

"(B) One cause of these problems is that product liability law is fraught with uncertainty and sometimes reflects an imbalanced consideration of the interests it affects. The rules vary from jurisdiction to jurisdiction and are subject to rapid and substantial change. These facts militate against predictability of litigation outcome.

"(C) Insurers have cited this uncertainty and imbalance as justifications for setting rates and premiums that, in fact, may not reflect actual product risk or liability losses." 44 Fed.Reg. at 62,716.

products liability insurance premiums can be reasonably and accurately calculated; and to provide other procedural changes to expedite early evaluation and settlement of claims."

Much of the attention given to statutes of repose concerns their inability to influence products liability insurance rates. Testimony was presented to North Dakota legislative committees to the effect that the legislature could not accomplish its intended purpose through this statute. The committees were informed that products liability insurance rates were determined on a national basis and that action by a single state legislature would have virtually no effect on the prices of products liability insurance. This was subsequently supported by the report of the Department of Commerce on the Model Uniform Product Liability Act, in which the following observation was made:

"Product liability insurance rates are set on the basis of countrywide, rather than individual state, experience. Insurers utilize countrywide experience because a product manufactured in one state can readily cause injury in any one of the other states, the District of Columbia, or the Commonwealth of Puerto Rico. One ramification of this practice is that there is little an individual state can do to solve the problems caused by product liability." 44 Fed.Reg. at 62,716 (1979).

It has been urged, however, that this argument must be kept in perspective and should not be used to force the state legislatures to "roll-over and play dead" when faced with products liability insurance rate problems.[16]

Section 28-01.1-02 does indicate that one of the main legislative goals involved in the North Dakota Products Liability Act, and certainly the goal which received the most attention, was to reduce products liability insurance rates with attendant benefits to industry, the public, and future claimants within limits. See 28-01.1-01. And while the legislature was provided with testimony suggesting that the statute of repose could not achieve this goal, the legislature decided to enact the statute nonetheless. The legislature apparently accepted the view that there was "a lack of adequate information from products liability insurers regarding their ratemaking procedures" and that this act would help solve the problem of "uncertainty resulting from the 'open-ended' liability exposure of products," thus making it possible "to accurately rate premiums." "Report of the North Dakota Legislative Council, Forty-sixth Legislative Assembly," at 139–140.

The suggestion that this legislative goal could not be achieved was based upon the argument that one state, especially a state the size of North Dakota, would have little or no effect on products liability insurance rates. However, the North Dakota Legislature was also informed that several other states had enacted measures similar to the North Dakota Products Liability Act. At least 48 states have had statutes that can be considered product liability statutes of repose. McGovern, 30 Am.U.L.Rev. at 580. At least twenty-one states have had statutes of repose intended specifically for products liability cases. McGovern, 30 Am. U.L.Rev. at 585. This information suggest-

---

**16.** Those attempting to bring under control the perceived "products liability insurance crisis" have apparently found themselves "between a rock and a hard place." As product liability insurance rates are set on a national basis, it may appear that the proper means of solving the "crisis" would be through federal legislation. Bills before Congress, however, have experienced little success. Some of this failure may be partially due to the lobbying efforts made by the National Conference of State Legislatures, American Bar Association, and the Conference of Chief Justices which have argued that a federal products liability law would violate the principles of federalism, promote confusion not uniformity, and "will disrupt practices and procedures that have been simplified and will require every state to begin again." See generally, Frumer and Friedman, 2A Products Liability, § 16DD.01.

The result of this failure in Congress means that those wishing to control products liability insurance rates must do so on the state level.

ed the existence of a trend among the states and that while one state might have little influence on insurance rates, a similar effort by many states could have a significant effect. Consistent with the idea that the existence of a trend could be significant to rate-making are the following findings of the December 21, 1979, report of the New Hampshire "Commission to Study Products Injury Reparations":

"Since products manufactured in one state are generally marketed nationally, and since legal action involving a nationally marketed product can arise virtually anywhere, product liability rates are unlikely to be influenced by other than national trends."

See Frumer and Friedman, 2A *Products Liability*, § 16C[1][iii]. *See also* 44 Fed. Reg. at 62,716–717; *Berry v. Beech Aircraft*. I consider it important that, at the time 28–01.1–02 was passed by the legislature, there did appear to be a common concern in the state legislatures relating to products liability insurance rates. Apparently the most common solution for attacking the problem of products liability insurance rates has been the enactment of statutes of repose similar to, albeit not uniform

with, 28–01.1–02. McGovern, 30 Am.U.L. Rev. at 579–80.

Pertinent for possible future consideration by our legislature is a statement by the Alabama Supreme Court:

"The harshness of an absolute date-of-use limitation period is evident when compared to the Model Uniform Product Liability Act proposed by the Commerce Department. Section 110(B)(1) of the Act states:

'In claims that involve harm caused more than ten (10) years after time of delivery, a *presumption* arises that the harm was caused after the useful safe life had expired. This presumption may only be rebutted by clear and convincing evidence.' (emphasis added)

The Model Act merely creates a presumption and does not provide for an absolute cut-off date." *Lankford,* 416 So.2d at 1003.

Section 110(A) of the Model Uniform Product Liability Act, which creates a defense for a manufacturer if the injury occurs after the ordinary useful life of the product, also may be worthy of consideration, 44 Fed.Reg. at 62,732.[17] *See also,* Minn. Stat. § 604.03 (1976).[18] However,

17. "*Sec. 110. Length of Time Product Sellers are Subject to Liability*

"(A) *Useful Safe Life.*

(1) Except as provided in Subsection (A)(2), a product seller shall not be subject to liability to a claimant for harm under this Act if the product seller proves by a preponderance of the evidence that the harm was caused after the product's 'useful safe life' had expired. 'Useful safe life' begins at the time of delivery of the product and extends for the time during which the product would normally be likely to perform or be stored in a safe manner. For the purposes of Section 110, 'time of delivery' means the time of delivery of a product to its first purchaser or lessee who was not engaged in the business of either selling such products or using them as component parts of another product to be sold.

Examples of evidence that is especially probative in determining whether a product's useful safe life had expired include:

(a) The amount of wear and tear to which the product had been subject;

(b) The effect of deterioration from natural causes, and from climate and other conditions under which the product was used or stored;

(c) The normal practices of the user, similar users, and the product seller with respect to the circumstances, frequency, and purposes of the product's use, and with respect to repairs, renewals, and replacements;

(d) Any representations, instructions, or warnings made by the product seller concerning proper maintenance, storage, and use of the product or the expected useful safe life of the product; and

(e) Any modification or alteration of the product by a user or third party.

(2) A product seller may be subject to liability for harm caused by a product used beyond its useful safe life to the extent that the product seller has expressly warranted the product for a longer period." 44 Fed.Reg. 62,732 (1979).

18. "*604.03. Useful life of product*

"Subdivision 1. In any action for the recovery of damages for personal injury, death or property damage arising out of the manufacture, sale, use or consumption of a product, it is a defense to a claim against a designer, manufacturer, distributor or seller of the product or a part thereof, that the injury was

the fact that the legislature might possibly have passed a statute that would have been less restrictive does not necessarily lead to the conclusion that there is not a close correspondence between the statutory classification and the legislative goals. The art of fashioning better solutions to problems such as this within the framework of our government is best left to the legislative branch.

While controlling products liability insurance rates has been given much attention, it is not the only legislative goal. Statutes of repose, such as 28–01.1–02, allow manufacturers to plan their affairs free from indefinite exposure to products liability claims and prevent claims when evidence may be unreliable and unavailable due to lapse of time. *Stutts v. Ford Motor Co.*, 574 F.Supp. at 105; *Davis v. Whiting Corp.*, 674 P.2d at 1195–96. It is possible that these objectives were part of the legislative effort in enacting 28–01.1–02.

In light of the evidence of the crisis nature of products liability insurance problems in North Dakota, and apparently nationwide, at the time of the enactment of 28–01.1–02, it does appear that there was not only a rational connection between 28–01.1–02 and its basic purpose of reducing products liability insurance rates, but also a close correspondence between 28–01.1–02 and that purpose, for with the liability being limited to a definite period of years, the risks would be more limited and could be more easily determined, resulting in lower rates or at least the availability of the insurance and, hopefully, both, as more and more states across the Nation adopted similar legislation.

In *Arneson v. Olson, id.,* this Court concluded after reviewing the findings of the legislature:

"The evidence in the case before us, however, indicates that either the Legislature was misinformed or subsequent events have changed the situation substantially. . . .

"[T]he trial court made a finding that there did not appear to be an availability or cost crisis in this State. We cannot say that this finding is clearly erroneous, based upon the evidence in this case.

"In the absence of such a finding of crisis, and in view of the drastic limitation on recovery, we conclude that the $300,000 limitation on recovery in malpractice cases is a violation of the equal-protection provision of the North Dakota Constitution." 270 N.W.2d at 136.

I believe the approach applied by the trial court and by this Court in *Arneson* was an erroneous approach, and accordingly, I will not apply it. It is not the function of the Court to second-guess the accuracy of a legislative determination of fact. *Minn. State Board of Health v. City of Brainerd,* 308 Minn. 24, 241 N.W.2d 624, 629 (1976), *appeal dismissed,* 429 U.S. 803, 97 S.Ct. 35, 50 L.Ed.2d 63 (1976). *See also, Montana-Dakota Utilities Co. v. Johanneson,* 153 N.W.2d 414, 423 (N.D.1967). Furthermore, it is not the responsibility of a court to strike down legislation based upon evidence which surfaces or events which occur subsequent to the passage of the legislation. It is the legislature's responsibility, at least initially, to adapt our statutes to conform to new evidence and circumstances and reasonable opportunity should be provided the legislature to accomplish that objective. *Application of*

---

sustained following the expiration of the ordinary useful life of the product.

"Subd. 2. The useful life of a product is not necessarily the life inherent in the product, but is the period during which with reasonable safety the product should be useful to the user. This period shall be determined by reference to the experience of users of similar products, taking into account present conditions and past developments, including but not limited to (1) wear and tear or deterioration from natural causes, (2) the progress of the art, economic changes, inventions and developments within the industry, (3) the climatic and other local conditions peculiar to the user, (4) the policy of the user and similar users as to repairs, renewals and replacements, (5) the useful life as stated by the designer, manufacturer, distributor, or seller of the product in brochures or pamphlets furnished with the product or in a notice attached to the product, and (6) any modification of the product by the user." Minn.Stat. § 604.03 (1976).

*Zimbelman,* 356 N.W.2d 99, 102 n. 1 (N.D. 1984).

Accordingly, I find that 28–01.1–02 does not violate Article I, Section 21, of our state constitution.

Although it has been urged that 28–01.1–02 also violates the equal protection clause of Section 1 of the Fourteenth Amendment to the United States Constitution, as we have been referred to no supporting authority, I shall assume there is none. My inexhaustive research indicates that authority is to the contrary. *See, Hartford Fire Ins. v. Lawrence, Dykes, Goodenberger,* 740 F.2d 1362; *Barwick v. Celotex Corp.,* 736 F.2d 946; *Wayne v. Tennessee Valley Authority,* 730 F.2d 392; *Braswell v. Flintkote Mines, Ltd.,* 723 F.2d 527; *Dague v. Piper Aircraft Corp.,* 513 F.Supp. 19.

Taking a cue from Justice White in a fairly recent case involving an equal protection issue, I am satisfied 28–01.1–02 does not offend that provision:

> "In ordinary civil litigation, the question frequently is which party has shown that a disputed historical fact is more likely than not to be true. In an equal protection case of this type, however, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley,* 440 U.S. 93, 110–111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171, 184 (1979).

I am not convinced that the legislative facts on which 28–01.1–02 is based could not be conceived to be true by the legislature. Accordingly, I believe that 28–01.1–02 does not violate the equal protection clause of the Fourteenth Amendment.

### Due Process

I shall next consider whether or not 28–01.1–02 violates the due process clauses of either our state constitution or the federal constitution.

As Hanson's major effort in this appeal has been to convince us to apply the strict scrutiny standard of review and to find a violation of the open court provisions of Article I, Section 9, of our state constitution, both of which I have declined to do as earlier indicated herein, and as I have also considered and found without merit her equal protection arguments, I am now left to consider her argument which seems to be that, because 28–01.1–02 cuts off her remedy without a *quid pro quo,* there is not a close correspondence between it and its legislative goals and it is not the least burdensome classification to accomplish the goals.

She has not clearly indicated or attempted to relate these assertions to due process as distinguished from equal protection. In any case, the assertion that the legislature failed to find the least burdensome classification is not proper except under the strict scrutiny standard of review and both Justice Gierke and I have found it inappropriate to apply that standard in this case.

Nor has Hanson indicated whether her apparent due process challenge is based on procedural due process grounds or substantive due process grounds. Procedural due process requires the right to notice and a fair hearing. *Parratt v. Taylor,* 451 U.S. 527, 538, 101 S.Ct. 1908, 1914, 68 L.Ed.2d 420, 430 (1981). *Schmidt v. Thompson,* 347 N.W.2d 315, 323 (N.D.1984). There is nothing in the record or in Hanson's allegations that in any way suggests that she did not receive adequate notice or a fair hearing. Accordingly, I assume Hanson is making a substantive due process challenge to 28–01.1–02.

While it is evident that the United States Supreme Court has abandoned its substantive due process views of the *Lockner* era, *see North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc.,* 414 U.S. 156, 94 S.Ct. 407, 38 L.Ed.2d 379 (1973); *Williamson v. Lee Optical of Oklahoma Inc.,* 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 583 (1955), the Court has not totally abandoned the principles of substantive due process. *See Roe v. Wade,* 410

U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). In recent years, when reviewing due process challenges to state statutes affecting one's right to recover in tort, the United States Supreme Court has merely required "a rational relationship between the state's purposes and the statute." *Martinez v. State of California,* 444 U.S. 277, 282, 100 S.Ct. 553, 557, 62 L.Ed.2d 481 (1980), *reh'g denied,* 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606 (1980). I believe 28–01.1–02 easily satisfies this test.

Having discovered the hard way in *North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc.,* 414 U.S. 156, 94 S.Ct. 407, 38 L.Ed.2d 379, that the United States Supreme Court had abandoned its substantive due process views of earlier years, on remand we found no due process violation of our state constitution in our statute regulating pharmacies. The United States Supreme Court found no violation of federal due process.[19] I believe the United States Supreme Court would take the same view in this case if called upon to decide this issue and I believe that the rationale of that case applies here.

Consistent with my views on the state equal protection argument, I believe that Section 28–01.1–02 does not offend Article I, Section 9, or Article I, Section 12, of our state constitution.

Accordingly, I find no due process violations of either our state constitution or the United States Constitution.

### Response to Justice Levine

Justice Levine has filed a special concurrence disclosing her concern for the lack of a close correspondence between the legislature's objective and the means it chose to reach that objective.

I feel compelled, with all due respect, to respond to her concern.

Having served years ago for a period of six years in the State Senate, and having therefore been forced, with other members of the legislature, to try to find solutions to a myriad of difficult problems, I know that body must often act to try to remedy problems when there is a sparsity of statistics and statisticians. In the legislative realm it is not unusual when common sense and a sense of logic must be applied to the evidence that is available to try to reach a reasonable, if not a complete or perfect, solution.

I don't think it can be seriously questioned that reducing a manufacturer's period of exposure to a lawsuit for an alleged defective product would reduce its liability, and that if all of the states or a substantial number of the states passed such legislation and the highest courts of the states upheld such legislation, the result would be a greater availability of liability insurance with an accompanying effect on the premiums. This is so because the law of supply and demand would then come into play.

As we have recently said in discussing Article I, Section 9, of our state constitution, we are not a super legislature.[20] Just as it is not the function of the judiciary to act as a super board, substituting its judgment for that of an administrative agency, it is not the function of the judiciary to act as a super legislature, substituting its judgment for that of the legislature. *Barnes County v. Garrison Diversion, Etc.,* 312 N.W.2d 20, 25 (N.D.1981). If the legislature is to remain the general policy-making

19. " 'Since the demise of the substantive due process analysis of *Lochner v. New York* (1905) 198 U.S. 45 [25 S.Ct. 539, 49 L.Ed. 937], it has been clear that the constitutionality of measures affecting such economic rights under the due process clause does not depend on a judicial assessment of the justifications for the legislation or of the wisdom or fairness of the enactment [i.e., the "adequacy" of the quid pro quo]. So long as the measure is rationally related to a legitimate state interest, policy determinations as to the need for, and the desirability of, the enactment are for the Legislature.' (Italics added.) (*American Bank [& Trust Co. v. Community Hospital* ], *supra,* 36 Cal.3d 359, 368–369, 204 Cal.Rptr. 671, 683 P.2d 670.)" *Fein v. Permanente Medical Group,* 38 Cal.3d 137, 211 Cal.Rptr. 368, 382, 695 P.2d 665, 679 (1985), *cert. granted,* —— U.S. ——, 106 S.Ct. 214, 88 L.Ed.2d 215 (1985).

20. *See Andrews v. O'Hearn, M.D.,* 387 N.W.2d 716 (N.D.1986).

body of our government, we should not handicap it by preventing it from reasonable experimentation.

In my view, although I do not advocate such an approach to the problem, the legislature could enact legislation which would in effect completely abrogate our Court's adoption of the principles of Section 402A of the Restatement (Second) of Torts (1965).[21] It seems to me that we, as a court, should encourage the lesser rather than the greater stricture.

I would affirm the judgment of the district court.

**21.** The passage of the North Dakota Products Liability Act was apparently partially due to our decision in *Johnson v. American Motors Corporation*, 225 N.W.2d 57 (N.D.1974). In *Johnson* we recognized a cause of action in North Dakota for strict liability in tort as encompassed in Section 402A, Restatement (Second) of Torts (1965), 225 N.W.2d at 66. Section 402A has been blamed as the cause of the "products liability insurance crisis." Frumer and Friedman, 2A *Products Liability*, § 16C[1][ii] (1985). Having been partly the cause of the problem, we should not prevent the Legislature from fashioning a reasonable partial solution to the problem.