**COOPERATIVE POWER
ASSOCIATION,
Plaintiff,**

v.

**WESTINGHOUSE ELECTRIC
CORPORATION,
Defendant.**

Civ. No. 920017.

Supreme Court of North Dakota.

Dec. 14, 1992.

Steven A. Storslee (appearance), of Fleck, Mather & Strutz, Bismarck, and David S. Evinger (argued) and David A. Engen (appearance), of Robins, Kaplan, Miller & Ciresi, Minneapolis, MN, for plaintiff.

Lawrence A. Dopson (argued), of Pearce & Durick, Bismarck, for defendant.

JOHNSON, Justice.

Under Rule 47, N.D.R.App.P., the United States District Court for the District of

North Dakota certified to this court the following question of law:

"May a manufacturer of a machine sold in a commercial transaction be held liable in negligence or strict product liability theory for economic loss caused by the failure of a component part of the machine, which causes direct damage to the machine only?"

We answer that question, "no."

Cooperative Power Association (CPA) owns and operates an electrical generating station, the Coal Creek Station, in Underwood, North Dakota. CPA uses step-up transformers to increase the voltage of electricity for transmission over power lines. Westinghouse Electric Corporation manufactures step-up transformers. CPA contracted to purchase a 566 MVA generator step-up transformer from Westinghouse for use at the Coal Creek Station for approximately $1,600,000. The step-up transformer is a large, box-shaped object with electrical coils which are connected to the power lines by metal conductors called bushings.[1] The contract between CPA and Westinghouse covered both the transformer and its bushings.

Westinghouse delivered the transformer and bushings to CPA in January 1987, and CPA placed the unit in service in November 1987. During installation, a CPA technician noticed that two of the bushings had a loose cap which caused a loose connection between the bushings and the power lines. According to CPA, Westinghouse advised CPA to tighten the bushings with a channel lock pliers without reference to any specified amount of torque.

In December of 1988, an electrical arc in a bushing damaged the bushing and contaminated the transformer coils with metal particles, requiring replacement of the bushings and rewinding of the coils. Westinghouse replaced the bushings, but refused to pay for rewinding the coils.

CPA sued Westinghouse in Federal court, alleging breach of express warranty, breach of contract, negligence, and negligent misrepresentation. CPA alleged that it had incurred damages for repair of the transformer and temporary replacement in an amount in excess of $1,600,000. Westinghouse moved for summary judgment dismissal of CPA's tort claims, asserting that, because CPA claimed damages only to the transformer, CPA's sole remedy was in contract.[2] CPA responded by asking the Federal court to certify three questions to this court.[3] Westinghouse objected to certification and also to the form of the questions. The Federal court certified a question essentially identical to the question presently before this court. CPA then moved to amend the certified question,[4] contending that the bushing was not a com-

---

1. Because the certification order did not include a "statement of all facts relevant to the questions certified" [Rule 47(c)(2), N.D.R.App.P.], our recitation of the underlying facts has been gleaned from the pleadings and other documents submitted by the parties and represents our understanding of those facts.

2. Both parties also moved for summary judgment on the claims for breach of warranty and breach of contract, and the Federal court denied their motions.

3. CPA requested the following certified questions:
   "1. Whether North Dakota law allows a tort recovery against the designer, manufacturer and distributor of a product (product A) that is attached to another product (product B) where:
   "a. Product A is defective pursuant to the North Dakota Products Liability Act;
   "b. Product A fails suddenly and calamitously; and

"c. The failure of Product A causes physical damage not only to itself, but also to Product B.
"2. Whether North Dakota law allows a tort recovery of property damage against the manufacturer of a product which fails as a direct result of the manufacturer's negligence in repairing and/or installing the product or as a result of the manufacturer's negligent misrepresentations."

4. CPA requested the following certified question:
   "May a manufacturer of a transformer sold in a commercial transaction be held liable in negligence or strict product liability for property damage, extra expense and business interruption loss caused by the sudden and calamitous failure of a bushing, (which connects a transformer to power lines) which causes direct damage to the bushing and the transformer only?"

ponent of the transformer and was a separate product. The Federal court stated that the "bushing is a 'component' part of the transformer unit, even though severable from it" and certified the present question about whether a manufacturer of a machine sold in a commercial transaction may be liable in negligence or strict liability for economic loss for damage to the machine only.[5]

CPA argues that the certified question should be answered "yes" with the qualification that a plaintiff seeking to recover in tort for economic loss must prove a defective and unreasonably dangerous product. CPA asserts that because products liability law in North Dakota focuses on the cause of injury, i.e., a defective and dangerous product, and not the type of damage incurred, our products liability law applies if a defective and unreasonably dangerous product fails and damages only itself. Westinghouse responds that the certified question should be answered "no" because contract law, not tort law, applies in a commercial setting when a defective product fails and damages only itself.

## I

■ In *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), the United States Supreme Court considered a similar issue in the context of admiralty law. The plaintiffs, charterers of four ships, sued the manufacturer of turbines installed in the ships in strict liability and negligence, alleging that the turbines were defectively designed. The plaintiffs alleged that the defects, which caused damage to the turbines themselves, entitled them to damages for the cost of repairs and for lost income while the ships were out of service. The Court, applying products-liability concepts to admiralty law, unanimously held "that a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." *Id.* 476 U.S. at 871, 106 S.Ct. at 2302.

The Court outlined the three approaches for determining whether an action may be brought in tort for damage to the product itself: (1) the majority approach, which precludes tort actions if a defective product damages only itself, *see Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965); *Jones & Laughlin Steel Corp. v. Johns–Manville Sales Corp.,* 626 F.2d 280 (3rd Cir.1980); (2) the minority approach, which permits tort actions if a defective product damages only itself regardless of whether the defect created an unreasonable risk of harm, *see Santor v. A & M Karagheusian, Inc.,* 44 N.J. 52, 207 A.2d 305 (1965); and (3) the intermediate "degree-of-risk" or "qualitative" approach, which differentiates between disappointed and endangered users and permits only the latter to sue in tort under an analysis focusing on the nature of the defect, the type of risk, and the manner in which the product is damaged. *See Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165 (3rd Cir.1981) [permits tort action for damage to a defective product resulting from an unreasonably dangerous condition and precludes tort action for damage resulting from a non-dangerous impairment in the quality of the product]; *Northern Power & Engineering Corp. v. Caterpillar Tractor Co.,* 623 P.2d 324 (Alaska

**5.** In the context of products liability cases, economic loss generally means pecuniary damage that occurs through loss of value or use of the goods sold or the cost of repair together with consequential lost profits when there has been no claim of personal injury or damage to other property. *E.g., Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965). CPA's complaint alleges losses which meet that definition of economic loss.

A commercial transaction generally has been interpreted to mean a transaction which is not a consumer sale and involves parties with relatively equal bargaining power who can negotiate the specifications for a product. *See Gem Developers v. Hallcraft Homes of San Diego, Inc.,* 213 Cal.App.3d 419, 261 Cal.Rptr. 626 (1989); *Lloyd F. Smith Co, Inc. v. Den–Tal–Ez, Inc.,* 491 N.W.2d 11 (Minn.1992); *Hapka v. Paquin Farms,* 458 N.W.2d 683 (Minn.1990); *Nelson v. International Harvester Corp.,* 394 N.W.2d 578 (Minn.App.1986). In comparison, the Uniform Commercial Code defines a "consumer good" as a good "used or bought primarily for personal, family, or household purposes." Section 41–09–09(1), [U.C.C. § 9–109(1) ] N.D.C.C.

1981) [permits tort action if a defective product creates a potentially dangerous situation and the product is damaged as a proximate result of the danger under calamitous circumstances].

The Supreme Court rejected the intermediate approach, concluding that it was too uncertain to enable manufacturers to structure their business behavior. The Court said that a distinction which rests on the manner in which the product was damaged, either by gradual deterioration and internal breakage or by a calamitous event, was not persuasive, because, by definition, no person or other property was damaged. Economic losses occurring as a result of a calamitous event essentially represented the failure of the purchaser to receive the benefit of the bargain, which is traditionally the core concern of contract law.

In analyzing the minority approach, the Court recognized that it fostered the safety and insurance rationales underlying tort liability and eliminated an arbitrary distinction between a defective product damaging only itself and a defective product causing bodily injury or damage to other property. However, the Court rejected the minority approach because it failed to keep tort liability and contract law in separate spheres and to maintain a realistic limitation on damages.

In adopting the majority approach, the Supreme Court stressed several factors: (1) tort concerns with safety are reduced when a product damages only itself; (2) damage to only the product itself means the product has not met the customer's expectations and is most naturally understood as a warranty claim; (3) warranty law is well suited for commercial controversies, which generally do not involve large disparities in bargaining power, so the parties can contractually set the terms of their agreements and, within limits, disclaim warranties or limit remedies while allowing purchasers to obtain the benefit of their bargain; (4) warranty law has built-in limitations on liability based on privity and the requirement of foreseeability of consequential damages as a result of a breach, whereas tort law confers a duty to the public generally and permits recovery for all foreseeable claims, which could subject manufacturers to indefinite economic losses by a purchaser's customers; and (5) recovery under warranty law establishes a bright line for damages to the product itself and avoids the uncertainty inherent in any attempt by courts to limit purely economic damages in tort.

The Court's rationale focuses on the different types of interests protected by tort and contract law. Tort liability protects a consumer's interest in freedom from injury regardless of the existence of an agreement between the parties. Underlying tort liability is the recognition that buyers and sellers of consumer products are generally in an unequal bargaining position and courts may desire to provide protection for the public from unsafe products beyond that provided by contract law. Tort law imposes responsibility on manufacturers of defective products because they are best able to encourage safer manufacture and design and to allocate the costs of injury arising from unsafe products. *See Johnson v. American Motors Corp.*, 225 N.W.2d 57 (N.D.1974) [adopting strict liability in tort, as set forth in Restatement (Second) of Torts § 402A, in North Dakota].

A contractual duty arises from society's interest in the performance of promises and has been traditionally concerned with the fulfillment of reasonable economic expectations. Society's need to spread losses is substantially lessened in commercial transactions where damage is to only the product itself, because those losses essentially relate to the benefit of the bargain between business entities. That loss is most frequently measured by the cost of repairs, the difference in the value of the product, or consequential damages attributable to the failure of the product to perform as expected. *See* fn. 5. Those losses are based upon, and flow from, the purchaser's loss of the benefit of the contractual bargain and are the type for which a warranty action provides redress.

In *East River* the Supreme Court aptly explained the rationale for distinguishing tort and contract law:

" 'The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products.' *Seely v. White Motor Co.*, 63 Cal.2d, at 18, 45 Cal.Rptr., at 23, 403 P.2d, at 151.

\*   \*   \*   \*   \*   \*

"Damage to a product itself is most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received 'insufficient product value.' See J. White and R. Summers, Uniform Commercial Code 406 (2d ed. 1980). The maintenance of product value and quality is precisely the purpose of express and implied warranties. See UCC § 2–313 (express warranty), § 2–314 (implied warranty of merchantability), and § 2–315 (warranty of fitness for a particular purpose). Therefore, a claim of a nonworking product can be brought as a breach-of-warranty action. Or, if the customer prefers, it can reject the product or revoke its acceptance and sue for breach of contract. See UCC §§ 2–601, 2–608, 2–612." *East River, supra,* 476 U.S. at 872, 106 S.Ct. at 2302–2303.

## II

Since *East River,* other courts have followed the majority approach in commercial transactions and precluded tort actions when a product damages only itself. *Aloe Coal Co. v. Clark Equipment Co.,* 816 F.2d 110 (3rd Cir.), *cert. denied,* 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987); *Florida Power & Light Co. v. Westinghouse Electric Corp.,* 510 So.2d 899 (Fla. 1987); *National Union Fire Ins. Co. v. Pratt & Whitney,* 107 Nev. 535, 815 P.2d 601 (1991); *Utah International, Inc. v.*

*Caterpillar Tractor Co.,* 108 N.M. 539, 775 P.2d 741 (1989); *Ohio Savings Bank v. H.L. Vokes Co.,* 54 Ohio App.3d 68, 560 N.E.2d 1328 (1989); *Oklahoma Gas & Elec. v. McGraw–Edison,* 834 P.2d 980 (Okl.1992); *Rem Coal Co., Inc. v. Clark Equipment Co.,* 386 Pa.Super. 401, 563 A.2d 128 (1989); *Continental Insurance v. Page Engineering Co.,* 783 P.2d 641 (Wyo. 1989). *See Neibarger v. Universal Cooperatives, Inc.,* 439 Mich. 512, 486 N.W.2d 612 (1992).

These cases recognize that, in commercial transactions, the policy considerations for ignoring the parties' contractual obligations are reduced, because the parties are free to negotiate regarding the specifications for a product and the risk of loss. In commercial transactions, those cases preserve the distinction between tort liability and contract law.

CPA nevertheless argues that a "risk of harm" analysis is applicable to commercial transactions because that analysis provides manufacturers with incentive to produce safe products. CPA asserts that it is only through fortuitous circumstances that this defective product did not damage other property or people in the area. Although society has a strong interest in safe products, the rules of negligence and strict liability for damage to property other than the product itself and for personal injury adequately protect that interest and provide manufacturers with incentive to produce safe products. As recently noted by the Minnesota Supreme Court, strict liability is "really a stripped-down model of a breach of warranty claim, with the result that the two remedies frequently overlap." *Lloyd F. Smith Co., Inc. v. Den–Tal–Ez, Inc.,* 491 N.W.2d 11, 14 (Minn.1992). We should also strive for a statement of liability principles which is capable of being communicated to a jury without intervention by a Professor of Tort Law. We believe the rationale of *East River* is persuasive in commercial transactions involving damage only to the product itself, and we adopt that rationale.

Our decision in *Hagert v. Hatton Commodities, Inc.,* 350 N.W.2d 591, 595 (N.D.

1984) supports that conclusion. In *Hagert* this court considered whether or not economic loss could be recovered under strict liability in tort and held that "economic loss, as distinguished from injury to property, may be recovered under express or implied warranty under the Uniform Commercial Code but not under [Restatement (Second) of Torts] § 402A, strict liability in tort." Although "economic loss" was not defined, *Hagert* preserves the distinction between tort and warranty actions and supports our conclusion that the manufacturer of a product sold in a commercial transaction may not be liable in tort for economic loss caused by failure of a component part of the product, which causes damage to the product only.

### III

■ We are not persuaded that Section 28–01.1–06(2), N.D.C.C., requires a different result. That statute defines a "product liability action" as "any action brought against a manufacturer or seller of a product, regardless of the substantive legal theory ... for or on account of personal injury, death, or *property damage*." [Emphasis added.] Although CPA argues that the term "property damage" indicates a legislative intent to make products liability theories applicable to a defective product that damages only itself, we disagree with that broad interpretation. CPA's interpretation of that statute would undermine the comprehensive body of law for sales transactions in Article 2 of the Uniform Commercial Code. Ch. 41–02, N.D.C.C. Tort law was not intended to undermine the Uniform Commercial Code. *E.g., Seely, supra.* It is an elementary rule of statutory construction that we construe related statutes in harmony in order to give meaning and effect to all provisions. *E.g., State ex rel. Kusler v. Sinner,* 491 N.W.2d 382 (N.D. 1992). The general purpose of Chapter 28–01.1, N.D.C.C., is to regulate and limit the scope of products liability actions. *See* 1979 Report of North Dakota Legislative Council, p. 139. In the absence of any specific legislative intent to the contrary, we decline to interpret Section 28–01.1–06(2), N.D.C.C., to broaden the scope of negligence and strict liability actions and effectively undermine the warranty provisions of the U.C.C.

CPA's reliance on *Vantage, Inc. v. Carrier Corp.,* 467 N.W.2d 446 (N.D.1991), and *Herman v. General Irrigation Co.,* 247 N.W.2d 472 (N.D.1976), is misplaced. In *Vantage* a defective furnace started a fire which caused property damage to the contents of a furniture and appliance store. The issue in *Vantage* involved an equal protection challenge to the statute of repose in Section 28–01.1–02, N.D.C.C. The manufacturer asserted that the rational basis test, not the intermediate level of scrutiny used in *Hanson v. Williams County,* 389 N.W.2d 319 (N.D.1986), was applicable to its equal protection challenge because *Hanson* involved a wrongful death action and *Vantage* involved only property damage. We said:

> "We are not persuaded that, for purposes of equal protection analysis of this statute of repose, we should attempt to distinguish between a claim for wrongful death and a claim for property damage because wrongful death claims also involve pecuniary or economic losses.... Wrongful death claims and economic losses are so interrelated that parsing Section 28–01.1–02, N.D.C.C., in the manner asserted by Carrier is impracticable.... The rationale for applying the intermediate level of scrutiny in *Hanson* is equally applicable to a claim for property damage, and Carrier's attempt to distinguish *Hanson* on that basis is not persuasive." *Vantage, supra,* 467 N.W.2d at 449. [Citations omitted.]

Although we recognized that, in North Dakota, a products liability action focuses on the cause of an injury, i.e., a defective product, and not the type of injury or the claim for relief, *Vantage* involved damage to other property and not damage only to the defective furnace. *Vantage* does not control our resolution of this issue.

In *Herman,* this court held that a trial court had clearly erred in finding that an engine in an irrigation system was not defective when it left the manufacturer. This court concluded that the seller of the

irrigation system was entitled to indemnity from the manufacturer of the engine for crop damage, a replacement engine, and other miscellaneous damages. However, no issue was raised, or considered, about the propriety of an action for damage only to the product itself. This court's decision in *Herman* is not dispositive of this issue.

We adopt the rationale of *East River* and conclude that a manufacturer of a machine sold in a commercial transaction may not be held liable in negligence or strict liability for economic loss caused by a failure of a component part of the machine which causes damage to the machine only.[6]

The answer to the certified question is, "no."

ERICKSTAD, C.J., and VANDE WALLE, MESCHKE and LEVINE, JJ., concur.

---

**6.** CPA asserts that its claim for negligent misrepresentation refers to claims after the sale was completed and while the transformer was being installed. CPA asserts those acts were outside the scope of any contract for sale and argues that this issue must be addressed in the answer to the certified question.

Westinghouse responds that any allegations of negligent representation were in the process of installation and therefore must be considered as part of the sales transaction. Westinghouse as-serts that if we answer the certified question no, we should address "the effect of a subsequent determination by the Trial Court that the negligence or negligent misrepresentation at the time of installation pled by CPA was part of the sales transaction."

To the extent that the certified question asks about negligence, we answer it no. However, we decline Westinghouse's invitation to answer any questions not certified by the Federal court.