**COOPERATIVE POWER ASSOCIATION, Appellant/Cross–Appellee,**

v.

**WESTINGHOUSE ELECTRIC CORPORATION, Appellee/Cross–Appellant.**

Nos. 94–3640 and 94–3792.

United States Court of Appeals, Eighth Circuit.

Submitted June 12, 1995.

Decided July 28, 1995.

**1338**

David A. Engen, Minneapolis, MN, argued (William A. Webster, Minneapolis, MN, and Steven A. Storslee of Bismarck, ND, on the brief), for appellant/cross-appellee.

Lawrence A. Dopson, Bismarck, ND, argued (Stephen D. Easton, on the brief), for appellee/cross-appellant.

Before BEAM, Circuit Judge, BRIGHT, Senior Circuit Judge and MURPHY, Circuit Judge.

BRIGHT, Senior Circuit Judge.

## I. INTRODUCTION

This diversity action arose from the sale of a step-up transformer by Westinghouse Electric Corporation ("Westinghouse") to Cooperative Power Association ("CPA"). CPA brought suit against Westinghouse after the transformer malfunctioned, apparently the result of improperly tightened bushing caps. CPA raised several tort and contract claims, ultimately winning a verdict in excess of $1.4 million on the basis of a negligent misrepresentation claim.

Immediately after the trial, however, the district court [1] vacated the verdict *sua sponte* and ordered a new trial, holding that the

negligent misrepresentation claim as submitted to the jury had not properly framed the issues. On the eve of the scheduled retrial and pursuant to Westinghouse's motion, the court ultimately dismissed CPA's amended complaint with prejudice.

CPA raises three issues on appeal. CPA first contests the district court's dismissal of its negligent misrepresentation claim, contending that North Dakota allows such claims regardless of whether the parties have entered a contractual relationship. CPA next contends that the court committed reversible error in requiring CPA to prove that it had given Westinghouse some additional consideration in exchange for an extension of their one-year "in service" warranty agreement. Finally, CPA argues that the district court improperly ruled that the U.C.C.'s implied warranties only apply when the buyer is not a "sophisticated business entity," and thus erred in refusing to instruct the jury on either of CPA's two implied warranty claims.

Westinghouse cross-appeals, claiming that the district court committed several procedural errors that preclude it from reinstating the jury verdict should we reverse the court's dismissal of CPA's negligent misrepresentation claim.

## II. BACKGROUND

Plaintiff Cooperative Power Association, a Minnesota electrical cooperative, owns and operates an electrical generating station in Underwood, North Dakota. CPA uses step-up transformers to increase the voltage of the electricity so that it can be transmitted over electrical power lines. Westinghouse Electric Corporation, a corporation organized under the laws of and doing its principal business in the Commonwealth of Pennsylvania, manufactures step-up transformers.

In 1986, after experiencing problems with one of its transformers, CPA contracted to purchase a huge step-up transformer from Westinghouse which would more efficiently transmit its power plant output to cooperatives in Minnesota. The step-up transformer

---

[1]. The Honorable Patrick A. Conmy, United States District Judge for the District of North Dakota.

is a large, box-shaped object with electrical coils connected to the power lines by metal conductors called bushings. The bushings protrude from the transformers like spark-plugs protruding from a small engine. The contract between CPA and Westinghouse covered both the transformer and its bushings. The step-up transformer was valued at approximately $1,600,000.

Westinghouse delivered the transformer and bushings to CPA on January 15, 1987. However, because of an earlier boiler explosion at the Underwood plant, a shutdown of part of the plant precluded CPA from immediately putting the Westinghouse transformer into service. The set-up transformer was finally up and running on November 7, 1987.

During the period of installation, several questions arose as to how to properly tighten the terminal caps located on each of the bushings. When the transformer arrived at the plant, CPA technicians noticed that two of the bushings had a loose cap causing a loose connection between the bushings and the power lines. CPA personnel contacted Westinghouse for advice either after not finding information in the installation instructions on how to tighten the caps or after not understanding the instructions they found. Westinghouse employee, Lex Curtis, apparently advised CPA technicians that the caps could simply be tightened with channel lock pliers. The assembly instructions which came with the transformer, however, indicated that the caps should be tightened with a torque wrench, enabling the installer to set the sealing pressure at a precisely measured force (in this case forty-pounds of pressure).

This suit arose when on December 15, 1988, an electrical arc in a bushing damaged the bushing and contaminated the transformer coils, thus requiring replacement of the bushings and rewinding of the coils. Both parties agree that the electrical arc resulted from improperly tightened bushing caps. Westinghouse replaced the bushings, but refused to pay for rewinding the coils.

CPA sued Westinghouse in federal court, alleging causes of action for breach of warranty, strict product liability, negligence, and negligent misrepresentation. The parties ultimately stipulated damages totalling approximately $2.4 million. Westinghouse moved for summary dismissal of CPA's tort claims, asserting that because CPA claimed damages only to the transformer CPA's sole remedy was in contract. CPA responded by asking the federal court to certify several questions to the North Dakota Supreme Court to determine whether CPA's tort claims could lie in that state. After the federal court agreed to certification, the North Dakota court ruled that Westinghouse could not be held liable in negligence or strict product liability where the only alleged damages were economic damages to the product itself. *Cooperative Power Ass'n v. Westinghouse Elec. Corp.*, 493 N.W.2d 661 (N.D.1992).

At the final pretrial conference, CPA moved to and was permitted to amend its complaint to add a count for breach of implied warranties. The case proceeded to trial on the express warranty, implied warranty, and negligent misrepresentation claims.

The trial focused on CPA's allegations that not only were the transformer and bushings defective, but also that Westinghouse had negligently instructed CPA on how to install the transformer. CPA first attempted to argue that the terminal caps on the bushings were not properly tightened when CPA received the transformer from Westinghouse's plant in Muncie, Indiana. In response, Westinghouse argued that proper installation of the transformer required the terminal caps to be removed and cleaned after delivery but before start-up. Accordingly, it made no sense to have the terminal caps tightened to particular specifications at the time of delivery since the caps would still have to be removed before installation.

CPA also challenged the instructions themselves, contending that they were inadequate in failing to properly notify CPA that the terminal caps had to be tightened with a torque wrench. During trial, however, Westinghouse produced the assembly instructions which specifically directed that a torque wrench was required.[2] Finally, CPA pre-

---

**2.** As we have observed, the instructions specifically directed tightening of the bolts to 40– pounds of pressure with a torque wrench. This claim lacks any merit whatsoever.

sented evidence alleging that Lex Curtis had misled CPA into believing that channel lock pliers could be used to tighten the caps. Westinghouse countered with evidence showing that Lex Curtis was an experienced technician who would never have offered such bad advice.

As for its express warranty claim, CPA was required to argue that the warranty was in effect on December 15, 1988, the date of the transformer's failure. Although the parties had initially agreed that the warranty provided only one year of "in service" protection, with the allowance of one additional year if the transformer had to be placed in storage before it could be energized, CPA claimed that the warranty ran for two years from the date of delivery, irrespective of when the transformer was placed into service. This claim was based upon an alleged modification of the warranty contract, arrived at after weeks of confused and confusing correspondence between the two parties. Westinghouse, however, contends that the warranty was never modified and that while the warranty period could have been as long as two full years after the date of delivery, for such a warranty period to exist the transformer would have had to have remained idle for one full year. Since the transformer was left in storage for only ten months (a result of the earlier boiler explosion), Westinghouse contends the warranty only extended for twenty-two months, ending on November 7, 1988—five weeks before the transformer broke down.

After the third day of trial and during the final charging conference, the district court decided that it would not instruct the jury on CPA's implied warranty claims, ruling that implied warranty claims were not available to a sophisticated buyer like CPA. However, the court agreed with CPA that Lex Curtis' alleged faulty instructions on tightening the terminal caps could constitute negligent misrepresentation under North Dakota law. As for CPA's express warranty claim, the court determined that any modification of the warranty term required the parties' mutual consent, and that if no additional consideration passed between the parties the jury would have to conclude that the contract had not

been modified and that the warranty had not been extended.

On October 22, 1993, the jury returned a verdict in favor of CPA. Although the jury determined that the product was not defective and that it was no longer under warranty on December 15, 1988, it did hold that Lex Curtis had negligently instructed CPA on tightening the terminal caps. Specifically, the jury apportioned damages at 60% for Westinghouse and 40% for CPA, resulting in a $1.44 million verdict for CPA, plus interest.

As we have already noted, immediately after the trial the court *sua sponte* vacated the verdict and ordered a new trial, holding that the negligent misrepresentation claim as submitted to the jury had not properly framed the issues. Because the court had been advised that Westinghouse and CPA had agreed to a separate contract for installation advice and consultation, the court believed this "installation" contract would provide a more appropriate foundation for analyzing CPA's negligent misrepresentation claim. CPA responded by submitting yet another complaint; however, this complaint made no reference to any "installation" contract. On the eve of the scheduled retrial, the court learned that, in fact, neither party would be producing a copy of the purported "installation" contract and that CPA had not relied upon any right or duty created by such a contract. Thus, pursuant to Westinghouse's motion, the court dismissed CPA's second amended complaint, stating that the tort claim of negligent misrepresentation was not available to CPA under the facts of this case. *Cooperative Power Ass'n v. Westinghouse Elec. Corp.*, No. A1–90–150 (D.N.D. Sept. 26, 1994) (Memorandum and Order). This appeal followed.

## III. DISCUSSION

### A. Negligent Misrepresentation

■ CPA's first claim on appeal contests the district court's dismissal of its negligent misrepresentation claim. In its second amended complaint, CPA alleged that Westinghouse's employee, Lex Curtis, negligently instructed CPA on how to tighten the bushing caps. CPA further alleged that the im-

proper advice proximately caused the same damages complained of in its contract counts. *See* CPA's Second Amended Complaint ¶¶ 32–35, Appendix at 50. CPA labeled this count as one of "negligent misrepresentation," and pled it separately from its contract counts.

■ Because the district court concluded on the eve of the scheduled retrial that North Dakota did not recognize a negligent misrepresentation claim without a showing of inducement to contract and because CPA had alleged no such inducement, the court dismissed CPA's complaint as failing to state a cause of action. *Cooperative Power Ass'n v. Westinghouse Elec. Corp.*, No. A1–90–150 (D.N.D. Sept. 26, 1994) (Memorandum and Order). On appeal, CPA challenges the district court's interpretation of North Dakota law, claiming that negligent misrepresentation claims are actionable even if not based on an underlying contractual relationship. We review the district court's determination of state law *de novo*. *Salve Regina College v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 1220–21, 113 L.Ed.2d 190 (1991).

We begin our discussion with a brief clarification of the relationship between tort and contract principles in the state of North Dakota to shed light on the nature and viability of CPA's negligent misrepresentation claim.[3]

In the earlier stages of this litigation, the North Dakota Supreme Court responded to a certified question put to it by the district court judge. That question required the North Dakota court to determine whether some of CPA's tort claims could survive when the company's only claimed injury was one of *economic loss*—defined as "pecuniary damage [resulting from damage to the product itself, and not] personal injury or damage to other property." *Cooperative Power Ass'n v. Westinghouse Elec. Corp.*, 493 N.W.2d 661, 663 n. 5 (N.D.1992). In response to the certified question, the court held that a strict economic loss claim could not lie in negligence or strict product liability. *Id.* at 662.

■ Although the court did not address Plaintiff's negligent misrepresentation claim—a claim initially proposed by CPA for certification, but not submitted by the district court—the court's response reflects North Dakota's strict demarcation between contract and tort principles. As the court later articulated the distinction, "[c]onduct that constitutes a breach of contract does not subject the actor to an action in tort for negligence, unless the conduct also constitutes a breach of an *independent duty* that did not arise from the contract." *Dakota Grain Co. v. Ehrmantrout*, 502 N.W.2d 234, 236–37 (N.D.1993) (emphasis added); *see also Pioneer Fuels, Inc. v. Montana–Dakota Utilities Co.*, 474 N.W.2d 706, 710 (N.D. 1991); *Hagert v. Hatton Commodities, Inc.*, 350 N.W.2d 591, 595 (N.D.1984).[4] Accordingly, because CPA has not presented evidence of an installation contract, separate and distinct from the purchase agreement, CPA's only ground for claiming a "breach of an independent duty" has been the doctrine of "negligent misrepresentation."

---

3. Because CPA continues to argue that the substance of its negligent misrepresentation claim also supports its warranty counts and because CPA had previously imported the substance of its warranty claims into earlier versions of the negligent misrepresentation count, the district court noted the inappropriateness (though creativity) of CPA's "attempt to graft a tort claim onto a contract warranty action." *Cooperative Power Ass'n v. Westinghouse Elec. Corp.*, No. A1–90–150, at 7–8 (D.N.D. Sept. 26, 1994) (Memorandum and Order).

   Further confusion arose when the district court granted a new trial on the negligent misrepresentation theory, in large part because the parties represented that there existed a contract for installation advice and consultation. Not only did the court believe that this contract would provide the framework for determining the rights and liabilities of the parties regarding the installation, but presumably the court thought it would also help frame the negligent misrepresentation claim. *Id.* at 2. No such contract ever materialized.

4. This court has recognized North Dakota's adherence to the so-called "economic loss" doctrine, noting that "[t]he premise behind the economic-loss doctrine is that tort law is the appropriate vehicle for recovery when a defective product causes personal injury or injury to property other than itself, but is not appropriate for use to reallocate the balance of the buyer/seller relationship." *MDU Resources Group v. W.R. Grace & Co.*, 14 F.3d 1274, 1278 n. 5 (8th Cir. 1994).

Only recently recognized by the North Dakota Supreme Court, the doctrine of "negligent misrepresentation" is derived from the court's interpretation of North Dakota's actual fraud statute, N.D.Cent.Code § 9–03–08 (1987). *See Bourgois v. Montana–Dakota Utilities Co.*, 466 N.W.2d 813, 817 (N.D. 1991). Section 9–03–08 provides that:

Actual fraud within the meaning of this title consists in any of the following acts committed by a party to the contract, or with his connivance, with intent to deceive another party thereto or to induce him to enter into the contract:

1. The suggestion as a fact of that which is not true by one who does not believe it to be true;

2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true though he believes it to be true;

3. The suppression of that which is true by one having knowledge or belief of the fact;

4. A promise made without any intention of performing it; or

5. Any other act fitted to deceive.

*Id.*

■ Subsection 2, unlike the other enumerated acts of actual fraud, eliminates "intent" as a necessary element and as interpreted by the court in *Bourgois* indicates that a claim of fraud may be actionable on the basis of mere negligence of representation. However, because a plaintiff claiming fraud must also demonstrate that the acts were committed "with intent to deceive another party thereto or to induce him to enter into the contract," a successfully raised negligent misrepresentation claim must also allege that the misrepresentation occurred in the context of a contractual inducement.

The "inducement to contract" requirement logically applies because the alternative, "with intent to deceive another" (set apart by the disjunctive "or"), does not require "inducement," but does require "intent." As negligent conduct is conduct that lacks intent, the fraud statute seems to suggest that negligent misrepresentation could only occur in a contractual context. In other words, the most reasonable interpretation of the bifurcated clause, "with intent to deceive another party thereto or to induce him to enter into the contract," suggests that negligent misrepresentation attaches to the latter, intentional fraud to the former. This was the conclusion reached by the district court, *see Cooperative Power Ass'n v. Westinghouse Elec. Corp.*, No. A1–90–150, at 4–7 (D.N.D. Sept. 26, 1994) (Memorandum and Order), and one strongly *suggested* by the court in *Bourgois*, 466 N.W.2d at 817–18 (characterizing negligent fraud claims as only arising in the context of contractual inducements).

Despite the language of the statute, CPA by brief and oral argument states that its negligent misrepresentation claim does not arise out of any contractual relationship with Westinghouse. Instead, CPA would have us extend the reach of negligent misrepresentation claims beyond the contractual inducement context. In support of this position, CPA relies on the *Bourgois* court's citation of California case law, particularly one lower appellate court's decision in *Grenell v. City of Hermosa Beach*, 103 Cal.App.3d 864, 163 Cal. Rptr. 315 (1980). According to CPA, *Grenell* applies the concept of negligent misrepresentation to parties not in a contractual relationship and because *Bourgois* cited the *Grenell* opinion, North Dakota would similarly recognize negligent misrepresentation claims in contexts other than those involving contractual inducements. We disagree.

The *Bourgois* court did recognize the "persuasive" effect that interpretations of California's fraud statute would have on interpretations of North Dakota's own fraud statute. *Bourgois*, 466 N.W.2d at 817–18. However, the *Grenell* opinion has little to do with California's fraud statute and instead primarily relates to its interpretation of California's governmental immunity statute. The North Dakota court never referred to the factual setting of the *Grenell* decision, nor did it ever suggest that California's fraud statute would allow the claim asserted here for negligent misrepresentation. *Bourgois*, 466 N.W.2d at 817.

■ In any event, regardless of what other jurisdictions have said about negligent

misrepresentation, we are confident that based on *Bourgois* and based on the clear import of the North Dakota fraud statute, a negligent misrepresentation claim in the state of North Dakota as between parties to a contract relates to a misrepresentation that allegedly induced one party to enter the contract or at least a misrepresentation in a contractual setting. Because CPA has offered no evidence of a contractual relationship regarding installation of the transformer, we conclude that the district court properly dismissed its claim.[5] Accordingly, we need not address Westinghouse's cross-appeal, consideration of which depended on our reversing the district court.

## B. Warranty Claims

Having determined that the district court properly dismissed CPA's negligent misrepresentation claim, we are left with CPA's two remaining claims of error, each relating to the court's handling of CPA's warranty claims.

■ CPA first contends that the court erred in requiring the jury to determine whether CPA gave some additional consideration to Westinghouse in exchange for an extension of their one-year "in service" warranty agreement. According to CPA, the U.C.C. does not require additional consideration for contractual modifications to be binding. *See* N.D.Cent.Code § 41–02–16(1) [U.C.C. § 2–209]. If correct, CPA would have us also hold that its modified agreement with Westinghouse provided for a two-year warranty term (without an "in service" restriction), which would cover the time when the transformer was put out of service. A factual dispute exists on this issue which the jury resolved against CPA.[6]

■ CPA's last remaining claim is that while the court submitted instructions—albeit allegedly inadequate instructions—on CPA's express warranty claims, the court erred in refusing to instruct the jury on either of CPA's two *implied* warranty claims, the warranties of merchantability and of fitness for a particular purpose. The court refused CPA's proposed instructions because of its belief that implied warranties should only operate as a matter of law in circumstances where the purchaser is dependent upon the seller's superior skill and knowledge. Concluding that the evidence did not support such a dependency in light of the parity of sophistication between these two

5. CPA also relies on North Dakota's pattern jury instructions in contending that negligent misrepresentation claims do not require the misrepresentation to occur in the context of a contractual inducement. In relevant part, the pattern instruction states that: "The representation must have been made with the intent to induce a party to rely on it." North Dakota Jury Instruction (Civil) 412 (1993). Because the instruction omits the express requirement of inducement *to contract*, CPA would have us conclude that North Dakota law does not have such a requirement. We disagree.

As CPA admits, the pattern instructions cite the *Bourgois* decision and North Dakota's actual fraud statute, § 9–03–08(2). These references would seem to indicate that for a negligent misrepresentation claim to arise the inducement must be contractual.

North Dakota's pattern jury instructions could also support a negligent misrepresentation claim where no contractual relationship between the parties exists; however, the only plausible source for such a claim is North Dakota's deceit statute, § 9–10–02. Cited by pattern instruction 412, North Dakota's deceit statute, § 9–10–02, is virtually identical to the state's fraud statute with the one exception that the deceit statute applies "where there is no contract between the parties."

*Bourgois*, 466 N.W.2d at 818 n. 5; *Dewey v. Lutz*, 462 N.W.2d 435, 442 (N.D.1990). CPA does not rely on the deceit statute in pressing its negligent misrepresentation claim on appeal. Accordingly, in this case, the pattern instruction's reference to "inducement" relates to North Dakota's fraud statute, and thus the required "inducement" *must* be contractual.

6. Westinghouse delivered the transformer to CPA on January 15, 1987. The transformer was officially "in service," beginning November 7, 1987. It broke down on December 15, 1988, over thirteen months after the "in service" start date. According to Westinghouse, it had never promised anything more than a one-year "in service" warranty. CPA, on the other hand, claims that the parties had modified their agreement to provide CPA with a full two-year warranty, irrespective of whether (or for how long) the transformer was "in service."

Question number one on the special verdict form asked the jury to determine whether "the parties agree[d] to a modification of the one year 'in service' warranty so that the transformer/bushing was under warranty on December 15, 1988. Yes [or] No?" The jury checked, "No." Appendix at 209.

commercial entities, the court denied the instructions.[7] CPA attacks this distinction as having no basis in law.

We note at the outset that we need not resolve these particular claims of error in rejecting CPA's appeal. *See Keenan v. Computer Associates Int'l, Inc.,* 13 F.3d 1266, 1271 (8th Cir.1994) (applying a harmless error analysis to allegedly improper jury instructions); *Maurer v. Wagner,* 509 N.W.2d 258, 261 (N.D.1993) (same). As Westinghouse has argued, the jury's determination that there existed no "defect" in the bushings or the transformer renders CPA's claims irrelevant.

When the jury issued its verdict, it did so on a special verdict form, which required the jury to answer nine short questions. Question number two asked the jury to determine whether "the transformer/bushing [was] defective. Yes [or] No." The jury checked, "No." Appendix at 209. In its complaint and throughout the trial, CPA had based its defect claim on exclusively three grounds: (1) Westinghouse had failed to properly tighten the bushing caps before shipping the transformer from its manufacturing plant in Muncie, Indiana; (2) Westinghouse's instruction manual failed to provide sufficient guidance on how to tighten the caps; and (3) Westinghouse's employee, Lex Curtis, negligently instructed CPA on tightening the caps. As summarized by CPA's counsel in closing remarks to the jury:

> It doesn't have to be manufactured wrong to be defective. It can be defective—the whole thing can be defective because of all of the things I talked to you about a few minutes ago—the installation instructions are not clear, the amendment they should have had wasn't furnished, the advice that was given was wrong, and the result of that was that a connection in the top part of that bushing was apparently improper and caused it all to heat. We don't know for sure whether it was from the tightening done at the CPA plant or at the Muncie plant, do we? We'll never know that. But that's the part of it, of course, where the problem occurred.

Trial Transcript, at 847.

Although the jury ultimately found some merit to CPA's negligent misrepresentation claim—at least as a tort claim—when the jury checked "no defect" on the special verdict form it had effectively rejected those grounds for relief which were based on alleged warranties. And now that we have affirmed the district court's dismissal of the third ground for relief—the negligent misrepresentation ground, CPA can establish no defect to sustain its warranty claims.[8] In other words, whether the express warranty extended long enough to cover the December 15, 1988 breakdown or whether CPA could raise an implied warranty claim against its fellow "sophisticated business entity" is immaterial if there exists no product defect that these warranties could cover.

■ Evidence of a defect is an indispensable element of any express or implied war-

---

7. Although the court cited no cases for its "sophisticated business entity" distinction, as a matter of law some jurisdictions do draw such a distinction.

   For example, in the Seventh Circuit, the "sophisticated business entity" distinction has been applied to both implied warranty of merchantability and fitness for a particular purpose claims. *See, e.g., Binks Mfg. Co. v. National Presto Industries, Inc.,* 709 F.2d 1109, 1121–1122 (7th Cir. 1983) (holding that there cannot be an implied warranty of merchantability between sophisticated business entities that have equal skill and knowledge concerning the transaction, particularly when a product is built and designed at the buyer's request and with the buyer's particular specifications since under those circumstances the product by definition no longer has an ordinary purpose); *H.B. Fuller Co. v. Kinetic Systems, Inc.,* 932 F.2d 681, 689–90 (7th Cir.1991) (refusing to recognize the applicability of the implied warranty of fitness for a particular purpose where the buyer had failed to establish that the seller had superior knowledge upon which the buyer was entitled to rely). *See generally* James J. White & Robert S. Summers, Uniform Commercial Code §§ 9–8, 9–10, at 476, 482–86 (3d ed. 1988).

   Whether North Dakota draws such a distinction in implied warranty cases and whether the facts of this particular case merit applying the distinction here, we need not decide. As the discussion in the text indicates, we have chosen to resolve this portion of CPA's appeal on other grounds.

8. CPA does not contest the jury's findings of "no defect," but as the textual discussion that follows indicates, CPA does contend that that finding is not dispositive of its implied warranty claims.

ranty claim. No party can (nor does) dispute this. What CPA does dispute, however, is the assertion that the jury's finding of "no defect" applies to CPA's implied warranty claims, particularly its claim of fitness for a particular purpose.[9] CPA contends that the elements of the implied warranty claims differ from the elements of the express warranty claim and that the jury's disposition of one claim is not necessarily dispositive of the others.[10] Although CPA's contention is certainly true under some circumstances, it is not true here.

■ In an action claiming breach of an implied warranty for fitness for a particular purpose, a product may be entirely free from defect but entirely unfit for the particular purpose that the purchaser intends to make of it. *Hennepin County v. AFG Industries, Inc.*, 726 F.2d 149, 155 (8th Cir.1984) (interpreting Minnesota law). As explained by the Official Comment:

> A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question. For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains.

U.C.C. § 2–315 cmt. 2 (1989).

■ Thus, for CPA to have been successful with its claim of implied warranty of fitness for a particular purpose, it would have had to establish that the transformer was not simply defective, but rather defective as to a "particular purpose." *See Northern Plumb-*

*ing Supply, Inc. v. Gates,* 196 N.W.2d 70, 74 (N.D.1972). For example, had CPA argued that the transformer/bushing was defective because it was unsuited or ill-equipped to accommodate CPA's particular needs (for example, the design failed to meet CPA's specifications), CPA may have been able to make an implied warranty of fitness for a particular purpose claim. CPA, however, has not and could not make such a claim. In fact, CPA has presented no evidence to indicate that the bushing cap problem would affect one particular purpose in using the transformer any differently than any other purpose. As the record indicates, the improperly tightened bushing caps and resulting transformer failure impeded *all* purposes for which the transformer could be used. Given that CPA has not alleged an additional or separate defect, if one defect rendered the transformer unsuitable for all purposes, then logically one cannot also claim it constituted a defect as to a particular purpose. To do so would render an implied warranty claim of fitness for a particular purpose meaningless. *See Soaper v. Hope Industries, Inc.,* 309 S.C. 438, 424 S.E.2d 493, 495 (1992).

In any event, the finding by the jury for CPA establishes at best a negligence claim not cognizable in this case. As to CPA's various warranty claims, in essence the jury finding of "no defect" in the product is dispositive, requiring rejection of those contractual claims.

## IV.  CONCLUSION

For the reasons stated above, we conclude that the district court did not commit reversible error. Accordingly, we affirm.

---

9. Although CPA contends that the elements for a claim of implied warranty of merchantability differ from its express warranty claim, CPA offers no explanation for *how* they differ, let alone how they *could* differ. Tellingly, CPA does not even attempt to point to any evidence of any inadequacy of the transformer which would support a breach of implied warranty of merchantability claim, other than the allegations the jury rejected in finding the transformer to be non-defective.

10. North Dakota's restatement of the U.C.C.'s implied warranty of fitness for a particular purpose states that:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

N.D.Cent.Code § 41–02–32 (2–315) (1983).